**UNITED STATES of America, Appellee,**

v.

**David F. DURENBERGER, Appellant.**

No. 94–3105.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1995.

Decided Feb. 24, 1995.

Carter G. Phillips, Washington, DC, argued the cause, for appellant. With him on the briefs were Mark D. Hopson, Thomas C. Green, and Jonathan E. Nuechterlein, Washington, DC, Doris S. Finnerman, Washington, DC, entered an appearance for appellant.

Raymond N. Hulser, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for appellee. With him on the brief was Jackie M. Bennett, Jr., Atty., U.S. Dept. of Justice, Washington, DC.

Before: RANDOLPH, ROGERS, and TATEL, Circuit Judges.

RANDOLPH, Circuit Judge:

On July 21, 1992, a federal grand jury returned a two-count indictment against David F. Durenberger, then a Senator from Minnesota. This is an appeal by the former Senator of two district court orders denying his motions to dismiss the indictment. The appeal is interlocutory, and the government questions our jurisdiction. We resolve the jurisdictional issues against the government, but agree with it and with the district court that this prosecution does not violate separation of powers principles or 2 U.S.C. § 68.

I

Pursuant to regulations of the Senate Committee on Rules and Administration, the Senate reimburses its members for expenses, including lodging, while they are traveling on official business. 2 U.S.C. § 58(e). Count I of the indictment charged Durenberger with conspiring to make and present false claims for reimbursement of travel expenses, in violation of 18 U.S.C. § 371, the general conspiracy statute. Count II charged him with submitting false claims to the Senate in violation of the False Claims Act, 18 U.S.C. § 287, which is set forth in the margin.[1]

1. 18 U.S.C. § 287 provides:
   Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not

For the purpose of deciding this appeal, we assume the government could prove the following assertions drawn from the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952). In order to be reimbursed, a Senator must sign and submit to the Senate Committee on Rules and Administration travel vouchers with "[h]otel bills or other evidence of lodging costs." Durenberger owned a condominium in Minneapolis, Minnesota, and through travel vouchers, recovered $3825 from the Senate for his stays in his unit during April, May, June, July and August 1987. Although Durenberger may have used his condominium on the dates set forth in his vouchers, his vouchers falsely reported that someone else owned the unit.

Durenberger purchased the Minneapolis condominium in 1979, the year after his election to the Senate. During the next decade, he regularly resided there while he was in Minnesota. In 1983, Durenberger engaged in a transaction designed to hide his ownership of the unit. He and another condominium owner formed a partnership, to which both contributed their condominiums. Durenberger then rented his unit from the partnership. When he stayed in his condominium, he sought and obtained from the Senate reimbursement for lodging expenses. In the summer of 1986, Durenberger's partner decided to dissolve the partnership. A deed executed by both individuals transferred ownership of the partner's condominium back to the partner on February 6, 1987. At this point, according to the government's brief, Durenberger again became sole owner of his unit. Brief for the United States at 6. Durenberger continued to submit travel vouchers to the Senate for his stays in the condominium through March 1987.

In June 1987, after receiving private legal advice that he could not continue to be reimbursed for staying in his condominium unless he shifted his ownership interest to a third party, Durenberger began looking for ways to accomplish this. In letters to two friends,

he wrote that the dissolution of his partnership had caused his "non-deductible" living expenses to increase by $550 a month. On August 27, 1987, Durenberger sold his condominium to Independent Service Company, whose president had managed Durenberger's 1978 Senate campaign and remained his close friend. The parties to this transaction agreed that Durenberger had the right to repurchase the condominium at the same price the company had paid for it. Durenberger and employees of Independent Service Company prepared various documents making it appear as though the company had purchased the condominium on April 1, 1987. In December 1987, Independent Service Company billed Durenberger for his stays in the condominium beginning in April 1987, nearly five months before the company owned the unit. Durenberger then submitted vouchers for reimbursement to the Senate based on the company's invoices, requesting $85 per night for forty-five visits from April 10 to August 26, 1987—a total of $3825. Both counts of the indictment are based on Durenberger's alleged misrepresentation of the condominium's ownership in these vouchers.

Durenberger filed a motion to dismiss the indictment on the ground that principles of separation of powers rendered the case nonjusticiable and, on the same day, another motion to dismiss on the ground that 2 U.S.C. § 68 barred his prosecution. The district court denied both motions in separate orders and this appeal followed.

## II

■ The usual prerequisite for appellate jurisdiction is a final judgment, final in the respect that it ends the case. Here, the orders denying Durenberger's motions, far from ending the case, allowed the prosecution to go forward. Each order may nevertheless be appealable as a "final decision" under 28 U.S.C. § 1291 if it fits within the "collateral order doctrine." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). This is a "narrow" exception, including only those or-

more than five years and shall be subject to a    fine in the amount provided in this title.

ders "that are conclusive, that resolve important questions completely separate from the merits, and that would render such important questions effectively unreviewable on appeal from final judgment in the underlying action." *Digital Equip. Corp. v. Desktop Direct, Inc.,* — U.S. —, — – —, 114 S.Ct. 1992, 1995–96, 128 L.Ed.2d 842 (1994). In criminal cases, orders refusing to dismiss an indictment in the face of a defendant's claim of double jeopardy, *Abney v. United States,* 431 U.S. 651, 659–61, 97 S.Ct. 2034, 2040–41, 52 L.Ed.2d 651 (1977), or a defendant's claim of speech or debate clause protection from prosecution, *Helstoski v. Meanor,* 442 U.S. 500, 506–08, 99 S.Ct. 2445, 2448–49, 61 L.Ed.2d 30 (1979), satisfy these standards. Pretrial appellate review may be had because otherwise the defendant might lose the "right not to be tried," which "can be enjoyed only if vindicated prior to trial." *United States v. Hollywood Motor Car Co.,* 458 U.S. 263, 269, 102 S.Ct. 3081, 3085, 73 L.Ed.2d 754 (1982) (per curiam).

■ In *United States v. Rose,* 28 F.3d 181, 185–86 (D.C.Cir.1994), we joined three other courts of appeals in expanding the list of immediately appealable orders to include those denying a defendant's claim of immunity based on principles of separation of powers. *See United States v. Claiborne,* 727 F.2d 842, 844–45 (9th Cir.), *cert. denied,* 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984); *United States v. Hastings,* 681 F.2d 706, 708–09 (11th Cir.1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); *United States v. Myers,* 635 F.2d 932, 935–36 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980). "Like speech or debate immunity, separation of powers immunity should protect legislators from the burden of litigation and diversion from congressional duties, whether the litigation be civil or criminal." *Rose,* 28 F.3d at 186. "Like the right secured by the speech or debate clause in *Helstoski* or the right secured by the double jeopardy clause in *Abney,* the right [to separation of powers immunity] is the freedom from the obligation to endure a criminal trial which would be wholly deprived of meaning if [a defendant] were forced to undergo trial before he could assert it." *Claiborne,* 727 F.2d at 844 (citation omitted).

■ The district court's order denying Durenberger's first motion fits comfortably within *Rose.* Durenberger argued that he could not be convicted of violating the False Claims Act, 18 U.S.C. § 287, unless his statements about who owned his condominium were "material." The statements could be "material," he maintained, only if the Senate's rules barred reimbursing a Senator for stays in out-of-town lodgings in which the Senator had an ownership interest. But the 1987 and 1988 versions of the rules were ambiguous in this regard. The district court could resolve the ambiguity in the Senate rules, he argued, only if it transgressed principles of separation of powers prohibiting the judiciary from intruding on the Senate's prerogative to "determine the Rules of its Proceedings." U.S. CONST. art. I, § 5, cl. 2. Durenberger's contentions thus amount to a claim that, as a former member of the Senate, he cannot be held to answer criminal charges when his liability depends on judicial usurpation of the Senate's exclusive right to formulate its internal rules. Although, for reasons we explain later, his separation of powers arguments fail on the merits, they are at least colorable. Under *Rose,* that is enough to confer appellate jurisdiction.

■ Whether we have jurisdiction over the court's order denying Durenberger's second motion is a closer question. Durenberger argued that his prosecution was barred by 2 U.S.C. § 68, which makes payments on vouchers by the Senate Committee on Rules and Administration "conclusive upon all the departments and officers of the Government." To say that appellate jurisdiction exists because § 68 reflects separation-of-powers "concerns" is far too general. Too many statutes could be so classified. The government may also be correct that, properly interpreted, § 68 does not free anyone from the burdens of a criminal trial for submitting false vouchers. But we must be careful at this stage to avoid letting our views about the merits influence the jurisdictional decision. Durenberger's position is that § 68 gives the Senate Rules and Administration Committee exclusive and unreviewable authority to determine who shall be entitled to reimbursement for expenses, that no other branch of government may question

the Senate's payments, and that forcing a Senator to defend his receipt of those payments in a criminal trial allows the other branches to accomplish what § 68 forbids, thereby destroying the immunity § 68 sought to confer. Regardless whether Durenberger is right about § 68, the claim as formulated is sufficient to entitle him to an appellate decision. The statute dates to the mid–1800's, *see* Act of Sept. 30, 1850, ch. 90, 9 Stat. 523, and was intended, Durenberger tells us, to preserve the "independence of Congress," and "the obvious design of the constitution." 5 Op. Att'y Gen. 191, 200 (1849). While Durenberger's contentions here differ from his separation-of-powers claims because they are rooted in a statute rather than directly in the Constitution, this is not fatal. A court's jurisdiction to hear an interlocutory appeal may rest on "an explicit *statutory* or *constitutional*" provision guaranteeing that "trial will not occur." *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 801, 109 S.Ct. 1494, 1499, 103 L.Ed.2d 879 (1989) (emphasis added). Although the issue is not free from doubt, we hold that the court's denial of Durenberger's motion invoking § 68 as a bar to his prosecution is a collateral order subject to interlocutory review.

## III

### A

▓▓▓ As to the merits, we agree with the government that the district court correctly

denied Durenberger's first motion. The disagreement between the parties is not so much about what the separation of powers doctrine entails. Both sides recognize that the Constitution confers upon each house of Congress the power to "determine the Rules of its Proceedings," U.S. CONST. art. I, § 5, cl. 2, and that a federal court may not decide a lawsuit asking it to impose judicially-formulated rules of conduct on the legislative branch. *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1379 (D.C.Cir.1981), *cert. denied,* 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982). The real point of contention is whether a judicial determination of the materiality of Durenberger's allegedly untruthful statements in his travel vouchers intrudes upon the Senate's administration of its rules.[2]

Under the 1987 and 1988 versions of 2 U.S.C. § 58(e),[3] a Senator was entitled to reimbursement for actual travel expenses not exceeding a per diem amount. The 1987–88 Senate regulations indicated that travel expenses included charges for lodging. CONGRESSIONAL HANDBOOK App. D § III(B)(1)(a) (Senate ed. Jan. 1988). With respect to travel vouchers, these regulations instructed persons travelling on Senate business to record their expenditures, "noting each item at the time the expense is incurred, together with the date," and to use this information for "the proper preparation of travel vouchers."

**2.** Durenberger's argument collapses if materiality is not an element of a § 287 offense, a matter this court has yet to decide but one about which other courts of appeals are divided. The Eighth and Fourth Circuits hold that materiality is an element of a § 287 offense, as it is under a related provision, 18 U.S.C. § 1001. *See United States v. Adler,* 623 F.2d 1287, 1291 n. 5 (8th Cir.1980); *United States v. Snider,* 502 F.2d 645, 652 n. 12 (4th Cir.1974). The Tenth and Second Circuits hold the opposite in light of the legislative history and language of § 287. *United States v. Parsons,* 967 F.2d 452, 455 (10th Cir.1992); *United States v. Elkin,* 731 F.2d 1005, 1009–10 (2d Cir.), *cert. denied,* 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984). For the purpose of this case, we shall assume that the Eighth and Fourth Circuits have it right.

**3.** The version of 2 U.S.C. § 58(e) in effect in 1987, when Durenberger incurred the travel expenses at issue, provided:

A Senator and the employees in his office shall be reimbursed under this section only for actual transportation expenses, essential travel-related expenses (as defined in this subsection) and per diem expenses (but not exceeding actual travel expenses) incurred by the Senator or employee while traveling on official business within the United States.

The version of § 58(e) in effect after January 1, 1988, when the Senate considered and granted Durenberger's reimbursement claims, added language stating that reimbursement claims must be "[s]ubject to and in accordance with regulations promulgated by the Committee on Rules and Administration of the Senate." It is of no moment which version of § 58(e) governs here. The result we reach would be the same under either one.

*Id.* at App. D § I(D). Whenever possible, such travel vouchers were to be "supported by receipts." *Id.*

■ These rules contemplate that persons travelling on Senate business will support their requests for reimbursement with truthful vouchers and accurate supporting receipts. They impose a duty of honesty and necessarily operate on the assumption that those submitting vouchers will not lie. Drawing this conclusion requires no resolution of ambiguities in the Senate's internal rules.

As Durenberger sees it, however, a court may find his false statements material only if it determines that the 1987–88 Senate rules did not permit him to be reimbursed for expenses connected with a lodging he owned.[4] Since the rules are uncertain on this subject, he thinks the court would have to make "an initial policy determination of a kind clearly for nonjudicial discretion," *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), in an area lacking "judicially discoverable and manageable standards for resolving" the issue, *id.* This miscasts the issue. The question is not whether Durenberger was entitled to reimbursement if he had submitted truthful vouchers, but whether the false statements in his vouchers were material because they were "capable of influencing" the Senate's reimbursement decision. *United States v. Diggs,* 613 F.2d 988, 999 (D.C.Cir.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980). As § 58(e) states, reimbursement may not exceed actual expenses. Where a traveller stays affects how much he pays for lodging. There is a significant and important difference between expenses sought for staying in one's own home and the cost of a night in a hotel room. The former involves self-dealing, the latter an arm's length transaction. It is easy to determine the accuracy of ex-

penses reported for a hotel room. It is not so simple to figure out the validity of expenses reported for a one-night stay in one's own home. How was the Senate to know if Durenberger's "actual" cost of spending one night in his condominium was in fact the $85 he requested? Had the Senate known of Durenberger's alleged ownership interest in the condominium, it might have sought additional information to verify that amount. Was it material that, rather than staying in a rented room, as he reported, Durenberger stayed in his own condominium? The answer quite clearly is yes, it was material to the *amount* of reimbursement. In giving that answer, a court does not impose on the Senate its version of what is and what is not reimbursable. Even if Durenberger is correct that in 1987 Senators could be reimbursed for staying in property they owned, the Senate rules demanded vouchers that were truthful about this.

Durenberger thinks that *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373 (D.C.Cir.1981), *cert. denied,* 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982), and *Winpisinger v. Watson,* 628 F.2d 133 (D.C.Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980), support his claim of nonjusticiability. In fact, both decisions are against his position. In *Cannon,* a *qui tam* plaintiff sued a Senator under 31 U.S.C. § 231 (1976), the civil analogue to § 287, claiming that the Senator had authorized the salary payment of an assistant who worked exclusively on the Senator's reelection campaign. *Cannon,* 642 F.2d at 1375. A Senator could authorize a staffer's compensation only for the performance of "official" duties. *Id.* at 1380. However, after extensive consideration, the Senate could not decide whether a staffer's official duties encompassed working on reelection campaigns. *Id.* at 1380–83. Because of "the absence of any

---

4. Durenberger relies on four sources to establish that a Senator's ownership of a lodging would not bar reimbursement: (1) nothing in the 1987 or 1988 federal statutes or Senate travel regulations prohibited a Senator from recovering such expenses; (2) an official Senate document provided that travellers on Senate business could "stay with relatives or other staff members and [could] reimburse the host" at Senate expense, OFFICIAL OFFICE EXPENSE ACCOUNT SEMINAR HANDBOOK

14 (Nov. 1988); (3) in 1991, the Senate adopted regulations prohibiting reimbursements for "mortgage payments, or rental fees associated with any type of leasehold interest," CONGRESSIONAL HANDBOOK App. D § I(B)(4) (Senate ed. as amended effective Oct. 1, 1991); and (4) letters from two Senators to Durenberger's attorney stated that Durenberger's ownership of the condominium would not have been material to his right to reimbursement.

discernible legal standard" or "congressional policy determination" regarding this question, the *Cannon* court dismissed the action as nonjusticiable. *Id.* at 1385. Similar prudential considerations precluded judicial resolution of the issues in *Winpisinger.* In that case, members of the Carter Administration were charged with misusing "federal power and funds to purchase the reelection of Jimmy Carter," in violation of a number of constitutional provisions. *Winpisinger,* 628 F.2d at 135. The *Winpisinger* court refused to hear the case, reasoning that this would "unquestionably bring the court and the Executive Branch into conflict because the court would be placed in the position of evaluating every discretionary consideration ... for traces of political expediency." *Id.* at 140.

In both *Cannon* and *Winpisinger,* maintenance of the action against the defendant placed the court in the position of "assum[ing] the role of political overseer of the other branches of Government." *Cannon,* 642 F.2d at 1385. Durenberger's prosecution raises no such concern. It does not require the district court to "develop rules of behavior for the Legislative Branch," *id.,* nor does it ask the court to "interject itself into practically every facet of [a coordinate] Branch of the federal government, on a continuing basis," *Winpisinger,* 628 F.2d at 139. Rather, the district court is called upon simply to determine whether untruths in a Senator's travel vouchers could influence the Senate's reimbursement decision. *Cannon* specifically contemplates this judicial role: "we do not, of course, say that Members of Congress ... may defraud the Government without subjecting themselves to statutory liabilities." *Cannon,* 642 F.2d at 1385; *cf. United States v. Diggs,* 613 F.2d 988, 1001 (D.C.Cir.1979) ("The defendant clearly was tried not for violating the internal rules of the House of Representatives but for violating ... false statements statutes [18 U.S.C. § 1001].").

Taking his argument one step further, Durenberger claims that his case is nonjusticiable even if 1987–88 Senate travel regulations had manifestly barred him from receiving the reimbursement he sought. He maintains that a § 287 prosecution against a Senator is nonjusticiable whenever liability can be measured only by internal congressional rules, rather than substantive federal statutes. To support this contention, Durenberger points to *United States v. Eilberg,* 507 F.Supp. 267, 272 (E.D.Pa.1980), in which the government sued a congressman under 31 U.S.C. § 231 (1976), for misrepresenting as "official" a number of toll telephone calls. In dictum, the *Eilberg* court stated that if there had "been no *statute,* but merely a House *rule,* embodying the norm of 'officialness' as the standard for toll call chargeability," the government's claim against the congressman for false statements would have been nonjusticiable. *Eilberg,* 507 F.Supp. at 281. Because no statute made ownership relevant to a Senator's claim for reimbursement, Durenberger concludes that the government may not maintain its prosecution against him.

This argument warrants little discussion. Whatever the force of the *Eilberg* dictum,[5] Durenberger's prosecution is grounded in a substantive federal statute—2 U.S.C. § 58(e), which permits a Senator's reimbursement only for *actual* travel expenses. To repeat, Durenberger has not been charged simply with obtaining reimbursement for stays in a condominium he owned, in violation of an internal Senate rule. He has been indicted for making false statements regarding his ownership of that condominium in travel vouchers. Since a Senator travelling on Senate business is entitled only to reimbursement of actual costs, 2 U.S.C. § 58(e), his ownership interest in the condominium is relevant to determining the amount of those costs. Durenberger's position thus parallels that of the *Eilberg* defendant, against whom the court ultimately permitted a lawsuit because a federal statute, 2 U.S.C. § 46g, spe-

---

**5.** The *Eilberg* dictum is inconsistent with *Cannon.* The *Cannon* court canvassed years of Senate rules, policies and practices to determine if the defendant's conduct conflicted with an internal Senate standard. *Cannon,* 642 F.2d at 1380–82. Although it found no such standard, the court's methodology indicated that liability under 31 U.S.C. § 231 (1976) would have attached had the defendant violated an internal Senate rule. *See also United States v. Diggs,* 613 F.2d at 995–97, which looked to House committee orders to determine whether false statements in payroll authorization forms violated a congressman's "official and representative" duties.

cifically barred nonofficial use of House telephones. *Eilberg,* 507 F.Supp. at 284. As we said in *Rose,* 28 F.3d at 190, "by codifying [the] requirements in a statute, Congress has empowered the executive and judicial branches to enforce them." Indeed, Durenberger's description of *Eilberg* captures his own situation: the false claims provision under which he has been prosecuted, § 287, is "simply a procedural vehicle by which to enforce" 2 U.S.C. § 58(e). Brief for Appellant at 33 n. 14.

### B

We also affirm the district court's order rejecting Durenberger's contention that 2 U.S.C. § 68 prohibits his prosecution. That section provides:

No payment shall be made from the contingent fund of the Senate unless sanctioned by the Committee on Rules and Administration of the Senate. Payments made upon vouchers or abstracts of disbursements of salaries approved by said Committee shall be deemed, held, and taken, and are declared to be conclusive upon all the departments and officers of the Government....

Durenberger maintains that he may not be prosecuted for making a false claim in violation of 18 U.S.C. § 287 because the "plain and unambiguous terms" of § 68 foreclose the Department of Justice from "second-guessing" a Rules Committee determination to grant payment on such vouchers. Brief for Appellant at 36. This misapprehends the effect of § 68.

The statute is derived from an 1850 appropriations act, Act of Sept. 30, 1850, ch. 90, 9 Stat. 523, putting to rest a controversy between the Senate and the Department of the Treasury. Each Senator had, since 1818, been "entitled to receive eight dollars for every day he has, or shall attend, the Senate, and shall also be allowed eight dollars for every twenty miles of estimated distance, by the most usual road from his place of residence to the seat of Congress." Act of Jan. 22, 1818, ch. 5, 3 Stat. 404. When the President of the Senate certified claims for per

diem and travel expenses pursuant to this legislation, the Comptroller sometimes questioned the propriety of the claims. In 1849, Attorney General Johnson, interpreting the 1818 Act in light of custom and usage, issued an opinion stating that the Senate's certificate was "conclusive" on the Treasury so that it could not question the validity of a certified claim. 5 Op.Att'y Gen. 191, 203, 204 (1849). The 1850 Act, reflecting Attorney General Johnson's opinion, declared that the "true interpretation" of the Act of 1818 was that all certificates granted by the presiding officer of the House or Senate for compensation to members of either body "are, and ought to be, deemed, held, and taken, and are hereby declared to be, conclusive upon all the departments and officers of the government of the United States." Act of Sept. 30, 1850, ch. 90, 9 Stat. 523. Section 68 reached its present form in 1888. Rather than a certificate from the presiding officer of the Senate, reimbursement requests were to be handled by the "Committee to Audit and Control the Contingent Expenses of the Senate"[6] and it was the Committee's "payments made upon vouchers" from a "contingent fund" that were deemed to be conclusive. Act of Oct. 2, 1888, ch. 1069, 25 Stat. 546.

As its history shows and as its language indicates, § 68 bars the Executive Branch from second-guessing the determination of the Senate Rules and Administration Committee to pay a Senator for travel expenses. *United States ex rel. Hollander v. Clay,* 420 F.Supp. 853, 858 (D.D.C.1976), reached the same conclusion with respect to 2 U.S.C. § 95, the House counterpart to § 68. Judge Flannery there rejected the defendant's claim that § 95 immunized him from a civil action under the False Claims Act, 31 U.S.C. § 231 (1976), an argument similar to the one pressed upon us in this case. After carefully analyzing the history behind the enactment of § 95, Judge Flannery ruled that the "term conclusive meant only that the Treasury must honor the request of a coordinate branch of government for disbursement of funds." *Id.; see Eilberg,* 507 F.Supp. at 273. It did not mean that members were free to

---

6. In 1946, the "Committee on Rules and Administration" replaced the "Committee to Audit and Control Contingent Expenses." Act of Aug. 2, 1946, ch. 753, § 102(*o*)(1)(A), 60 Stat. 812, 820.

obtain payments from the Committee by fraud or deceit. Section 68 governs financial dealings between the Senate and the Treasury. No one in the Executive Branch contests the Senate Committee's decision in 1988 to authorize the $3825 paid to Durenberger on his vouchers. For all the Committee knew, the vouchers truthfully reported where he had stayed and the expenses he incurred. The question for trial is not whether the Committee should have authorized the payments to Durenberger, or whether the Treasury should have honored the authorization, as § 68 required it to do, or whether the Senate should pay the money back. The question is whether Durenberger defrauded the Senate, and on that subject § 68 has nothing to say.

*Affirmed.*