UNITED STATES of America, Appellee,

v.

Henry G. CISNEROS, Appellant.

No. 98–3094.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 4, 1999.

Decided March 9, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied May 12, 1999.*

* Circuit Judges Ginsburg, Sentelle and Garland did not participate in this matter.

Barry S. Simon argued the cause for appellant. With him on the briefs were Brendan V. Sullivan, Jr. and Marcie R. Ziegler.

Mathew S. Rosengart, Senior Associate Independent Counsel, argued the cause for appellee. With him on the brief were David M. Barrett, Independent Counsel, James P. Fleissner and Mark V. Jackowski, Senior Associate Independent Counsel.

Before: HENDERSON, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Henry G. Cisneros, former Secretary of Housing and Urban Development, brings this appeal from an order of the district court denying his motion to dismiss Counts 1 through 18 of a 21–count indictment returned against him, two of his former employees (Sylvia Arce–Garcia and John D. Rosales) and Linda D. Medlar, his one-time girlfriend. Independent Counsel David M. Barrett prosecuted the case. Cisneros sought a dismissal on the ground that any adjudication of the charges against him would run afoul of the separation of powers doctrine. The first and, as it turns out, the only question we must decide is whether we have jurisdiction to hear the appeal despite its interlocutory nature.

I

The Presidential Transition Act of 1963 declared the purpose of Congress to promote "the orderly transfer of the executive power in connection with the expiration of the term of office of a President and the inauguration of a new President." Presidential Transition Act of 1963, Pub.L. No. 88–277, 78 Stat. 153 (1964) (codified at 3 U.S.C. § 102 (notes)). One of the immediate tasks facing any newly-elected President is to begin forming a Cabinet. For a smooth transition, the selection of potential nominees, the investigations of their backgrounds, and the adjudications of their security clearances must begin well before the President takes the oath on January 20th. U.S. Const. amend. XX, § 1.

To these ends, President-elect Clinton and Warren Christopher, the head of his transition team, signed a Memorandum of Understanding with Attorney General Barr of the outgoing Bush Administration a few days after the November 1992 election. Indictment, Background, at p. 6, ¶¶ 5–6. The Memorandum stated that upon written requests of President-elect Clinton, the FBI would conduct background investigations of his prospective nominees. Memorandum of Understanding at 1. According to the Memorandum, the FBI would have two principal objectives in conducting its investigations. First, it should "ascertain facts and information relevant to the candidate's suitability for Federal government employment ... in accordance with Executive Order 10450," *id.* Second, it should compile information to "permit adjudication of the candidate for clearance for access to Sensitive Compartmented Information, when necessary, in accordance with the standards set forth in Director of Central Intelligence (DCI) Directive 1/14." *Id.*

Executive Order No. 10450, relied upon in the Memorandum of Understanding, has been in effect since President Eisenhower issued it in 1953. In order to ensure that all officers and employees would be "reliable, trustworthy, of good conduct and character, and of complete and unswerving loyalty to the United States," Executive Order No. 10450 directed investigators to develop information regarding the candidate's "deliberate misrepresentations, falsifications, or omissions of material facts," any "criminal" or "dishonest" conduct on the individual's part, facts concerning the candidate's susceptibility to "coercion, influence, or pressure which may cause him to act contrary to the best interests of the national security," and other behavior by the candidate indicating that he is "not reliable or trustworthy." Executive Order No. 10450, 18 Fed.Reg. 2489 (1953). The information developed by the FBI would be used, not only by the President-elect, but also by the Personnel Security Office of the Department of Justice in determining whether to grant the candidate a national security clearance.

After President-elect Clinton identified Cisneros as a potential nominee for HUD Secretary, Cisneros completed a "Questionnaire for Sensitive Positions (For National Security)," commonly known as an "SF–86." Indictment, Background, at pp. 13–14, ¶ 19. Pursuant to the Memorandum of Understanding, Cisneros's SF–86 and a written request from President-elect Clinton triggered the FBI's full-field investigation. Although the conspiracy count (Count 1) of the Indictment stretches from the summer of 1992 through September 1994, the focus of this count and the other counts naming Cisneros (Counts 1 through 18) is the period between the election of President Clinton in November 1992 and the appointment of Cisneros as HUD Secretary in late January 1993.

According to the charges, Cisneros set out to deceive the FBI and the Department of Justice, all to the end of ensuring his nomination, confirmation, appointment and continuation in office. What Cisneros wrote in his SF–86 and what he said to FBI. special agents in two background interviews are at the heart of the case. It would serve no useful purpose to recite each of the counts in detail. Suffice it to say that if the charges are proved, Cisneros repeatedly lied about and concealed the fact that he had paid large amounts of money to Medlar ($44,500 in 1990; $73,000 in 1991; $67,500 in 1992); that even during the FBI's investigation of him from December 1992 through early January 1993, he continued to pay Medlar while denying that he was doing so; that although Cisneros stated on a supplemental SF–86 that he was not subject to blackmail and although he told the FBI that Medlar had not threatened or coerced him, he continued making payments because Medlar was still threatening to expose him; that Cisneros illegally structured some of these payments to avoid having a Currency Transaction Report filed, itself a felony (*see* 31 U.S.C. §§ 5324, 5322(a); *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)); and that he failed to file gift tax returns with the Internal Revenue Service reporting his payments to Medlar. (After the magnitude of the payments became known in the summer of 1994, the IRS opened an investigation of Cisneros.)

Count 1 charges conspiracy among Cisneros, Medlar, Arce–Garcia, and Rosales, in violation of 18 U.S.C. § 371. Counts 2 through 17 charge Cisneros with violating 18 U.S.C. § 1001. Count 18 charges him with obstruction of justice, in violation of 18 U.S.C. § 1505, by influencing and impeding the Justice Department's inquiry into whether to grant him a security clearance.

## II

### A.

■ As to Counts 2 through 17, Cisneros's argument on appeal, like his motion to dismiss, proceeds as follows. To prove the violation of 18 U.S.C. § 1001,[1] as alleged in each of these counts, the government would have to show that the facts Cisneros concealed or the false statements he made on his SF–86 and to the FBI were "material." *See United States v. Hansen,* 772 F.2d 940, 949 (D.C.Cir. 1985). "The 'central object' of any materiality inquiry is 'whether the misrepresentation or concealment was predictably capable of affecting, *i.e.,* had a natural tendency to affect, the official decision.' " *In re Sealed Case,* 162 F.3d 670, 673–74 (D.C.Cir.1998) (quoting *Kungys v. United States,* 485 U.S. 759, 771, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)). Cisneros argues that "courts may not adjudicate" materiality in this case. As he sees it, the separation of powers doctrine precludes the Judicial Branch from considering what information would be capable of influencing the President or the Senate in evaluating prospective cabinet officers. Hence, materiality cannot be established and Cisneros cannot be convicted of violating § 1001. Brief for Appellant at 11–12.[2]

Cisneros stakes out a bold position indeed, and he admits as much. As to his specific situation, he maintains that the information he allegedly falsified and the facts he allegedly concealed did not influence President-elect Clinton's decision to nominate him. He backs this up with an off-the-record assertion. According to Cisneros, he made the President-elect and the Transition Team "fully aware" of the "information about which he allegedly deceived the FBI" and the President-elect nevertheless decided not to withdraw his nomination. Brief for Appellant at 25 n.13.[3] Apart from the particulars of his nomination, Cisneros believes that no potential Presidential appointee undergoing a background investigation has a judicially enforceable obligation to tell the truth in filling out forms or in talking with FBI agents. In other words, if such an individual falsified information about himself or covered up his misconduct, no legal consequences could follow. Judge Sporkin thought that Cisneros's "position would allow unqualified candidates for high public office to lie their way into extremely sensitive and important positions of government." Memorandum Opinion and Order, Sept. 17, 1998, at 5 (denying appellant's motion for reconsideration). Relying on our holding on the merits in *United States v. Durenberger,* 48 F.3d 1239 (D.C.Cir.1995), Judge Sporkin denied Cisneros's motion to dismiss, rejecting his argument that the prosecution impermissibly intruded upon the prerogatives of the executive and legislative branches to nominate and confirm prospective Cabinet members. Memorandum Opinion, July 30, 1998, at 12–14.

---

1. During the period covered by the Indictment, 18 U.S.C. § 1001 read as follows:

   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

   The False Statements Accountability Act of 1996, Pub.L. No. 104–292, § 2, 110 Stat. 3459, revised this section.

2. Cisneros also claims that the background investigation was not a "matter within the jurisdiction" of the FBI for purposes of § 1001 because, in conducting the investigation, the FBI acted pursuant to orders of President-elect Clinton, and the President-elect is not a "department or agency of the United States." *See* Brief for Appellant at 34–35. We agree with a concession Cisneros makes elsewhere in his brief: "these issues are not directly before the Court." *Id.* at 10 n. 6.

3. Given our disposition of this appeal on jurisdictional grounds, we reach no judgment about the relevance of any of this.

■ Whether Judge Sporkin ruled correctly is not our immediate concern, however. Without a judgment ending the case on the merits and leaving "nothing for the court to do but execute the judgment," *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945), the courts of appeals generally do not have appellate jurisdiction. Here the trial has not even begun. Proceedings in the district court remain on hold pending the completion of this appeal. Already more than two years have passed since the indictment came down. Avoiding delay is one of the reasons behind the final judgment. rule. *See* 28 U.S.C. § 1291. Avoiding piecemeal review is another.

■ Still, Cisneros insists that we have jurisdiction to review Judge Sporkin's order refusing to dismiss Counts 2 through 17 because this was a "collateral order" of the sort mentioned in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).[4] While the collateral order doctrine of *Cohen* is sometimes described as an exception to the final judgment rule, it is more accurately treated as an interpretation of "final decisions" as used in 28 U.S.C. § 1291. *See Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994). To come within the Cohen doctrine, "the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).

■ In criminal cases, "the compelling interest in prompt trials" demands that courts apply the *Cohen* doctrine "with utmost strictness" and confine its scope. *Flanagan v. United States*, 465 U.S. 259, 265, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984); *see also United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 270, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982). In the years since *Cohen*, the Supreme Court has rarely permitted criminal defendants to appeal pretrial orders. The Court has identified only three types of mo-

tions in criminal proceedings whose denial falls within the collateral order category: "motions to reduce bail, *Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951), motions to dismiss on double jeopardy grounds, *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), and motions to dismiss under the Speech or Debate Clause, *Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979)." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989). Orders denying such motions, the Court has determined, would be "effectively unreviewable on appeal from a final judgment," for obvious reasons with respect to denials of bail, and in the cases of double jeopardy and speech and debate, because the defendant is asserting a right not to be tried.

■ The order Cisneros seeks to appeal, insofar as it refused to dismiss Counts 2 through 17, does not come within the collateral order doctrine for several distinct reasons. Each of these sixteen counts alleges that Cisneros's false statements or his concealment of material facts—all of which occurred before he took office—related to "a matter within the jurisdiction of departments and agencies of the United States, that is, the Federal Bureau of Investigation and the United States Department of Justice...." *See, e.g.*, Indictment, Count 2, ¶ 5. With this in mind, the government suggests that the separation-of-powers issue Cisneros is raising here might never arise at trial. Brief for Appellee at 26 n.12. The point is well-taken. In § 1001 prosecutions, it is up to the jury to decide whether the materiality element has been proven. *United States v. Gaudin*, 515 U.S. 506, 523, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). In instructing the jury, Judge Sporkin could define "materiality" with reference, not to the President's nomination decision or the Senate's confirmation decision, but to the FBI's investigative role under the Memorandum of Understanding and Executive Order No. 10450, and to the decision of the Department of Justice on Cisneros's security clearance. Much will depend on the

---

4. The government initially believed the same, but in post-argument supplemental briefing it altered its view.

trial evidence and on the government's (and the defendant's) proposed instructions. *See* FED.R.CRIM.P. 30. The district judge has not yet made a final decision on jury instructions, nor could he at this stage. Jury instructions "must be specifically tailored to the pleadings and evidence of the particular case.... Conduct alleged in the indictment, but not supported by evidence at trial, for example, should not be included in any instruction to the jury." EDWARD J. DEVITT ET AL., 1 FEDERAL JURY PRACTICE AND INSTRUCTIONS at III (4th ed.1992); *see, e.g., United States v. Harrington,* 108 F.3d 1460, 1471 (D.C.Cir.1997). While the judge firmly rejected Cisneros's separation-of-powers argument with respect to Counts 2 through 17, it therefore does not necessarily follow that he will instruct the jury in the terms Cisneros opposes. If we allow this appeal, we risk deciding a constitutional question that might evaporate were the case allowed to go to trial, free of appellate interruption. Refusing to adjudicate constitutional issues unless it is strictly necessary to do so is a time-honored practice of judicial restraint. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 78–79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *Youakim v. Miller,* 425 U.S. 231, 236, 96 S.Ct. 1399, 47 L.Ed.2d 701 (1976); *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 570 n. 34, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). The final judgment rule complements this practice. Piecemeal review causes an appellate court to decide issues that might not have survived if the case had proceeded directly to trial. *See, e.g., Johnson v. Jones,* 515 U.S. 304, 309, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Hollywood Motor Car Co.,* 458 U.S. at 265, 102 S.Ct. 3081. *Cohen* itself, as well as later Supreme Court decisions, thus indicate that district court orders "subject to reconsideration from time to time" during trial do not qualify as "final decisions" subject to immediate appeal. *Cohen,* 337 U.S. at 546–47, 69 S.Ct. 1221; *Clinton v. Jones,* 520 U.S. 681, 690 n. 11, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997); *Coopers & Lybrand,* 437 U.S. at 469, 98 S.Ct. 2454; *United States v. MacDonald,* 435 U.S. 850, 858–59, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978); *Ficken v. Alvarez,* 146 F.3d 978, 980 (D.C.Cir.1998). This last point is particularly telling here. During the course of Cisneros's trial, there will doubtless be opportunities for the district judge to revise and refine the analysis contained in his order refusing to dismiss the charges. In making evidentiary rulings and in formulating jury instructions the court will necessarily be deciding to what extent it will adhere to its initial judgment regarding Cisneros's claim that materiality cannot be defined in terms of the President's or the Senate's determinations of the suitability of nominees for high office. The order before us is therefore far from the sort of "fully consummated decision" qualifying as a collateral order. *Abney,* 431 U.S. at 659, 97 S.Ct. 2034. The district judge may not revisit his denial of the motion to dismiss, but his underlying rationale would remain subject to revision and reconsideration in light of the evidence produced at trial. At this point, there is no telling what the evidence will be or what instructions the district judge will give on materiality.

There is still another reason why Cisneros cannot fit his appeal into the collateral order doctrine. The "right" he claims is not one "which would be destroyed if it were not vindicated before trial." *MacDonald,* 435 U.S. at 860, 98 S.Ct. 1547. He therefore is unable to satisfy the third factor described in *Coopers & Lybrand.* Pretrial denials of a defense based on the Double Jeopardy Clause or the Speech or Debate Clause fall within the collateral order doctrine because these clauses confer immunity not merely from conviction, but from the burdens of having to defend against criminal charges. *See Helstoski,* 442 U.S. at 508, 99 S.Ct. 2445. The right "which would be destroyed if it were not vindicated before trial," *MacDonald,* 435 U.S. at 860, 98 S.Ct. 1547, is the defendant's constitutional right to be free of a trial altogether. The right Cisneros seeks to vindicate is quite different. In his opening brief, he framed it up this way: "any attempt to adjudicate the materiality element of the false statement charges against Mr. Cisneros would require a judicial inquiry into matters within the constitutional province of coordinate branches." Brief for Appellant at 17. This is nothing more than an argument that § 1001 is unconstitutional as applied to him. To that extent, Cisneros stands in no different position than any other criminal defendant who loses a pretrial motion attacking an

indictment on the ground that the underlying criminal statute is unconstitutional. The district court's order in such a case, and in Cisneros's case, would be fully reviewable on appeal should the defendant be convicted. There is nothing here that would be "effectively unreviewable" if the case proceeded to trial and final judgment. *See United States v. Munoz–Flores*, 495 U.S. 385, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). By Cisneros's lights, at least in his initial brief, the judicial intrusion he identifies—the violation of separation of powers—would flow from an "adjudication," not from holding the trial. *See* Brief for Appellant at 15, 17. As we have said before, materiality in a § 1001 prosecution is for the jury to decide and so, even as Cisneros sees it, there would be no deprivation of his right until the jury returned a verdict, that is, until the trial ended in conviction or acquittal.

■ After we called for supplemental briefing on the question of appellate jurisdiction, Cisneros reformulated his position. Now he tells us that "he is immune from prosecution on structural separation of powers grounds," and that "he should not be forced to endure a criminal trial where the very conduct of the trial itself will violate the separation of powers by causing the courts to invade the exclusive constitutional province of coordinate branches." Supplemental Brief for Appellant at 1–2. In other words, no longer is it the "adjudication" of materiality that will "violate the separation of powers"; it is the "very conduct of the trial." "One must be careful," the Supreme Court has reminded us, "not to play word games with the concept of a 'right not to be tried.' In one sense, any legal rule can be said to give rise to a 'right not to be tried' if failure to observe it requires the trial court to dismiss the indictment or terminate the trial. But that is assuredly not the sense relevant for purposes of the exception to the final judgment rule." *Midland Asphalt Corp.*, 489 U.S. at 801, 109 S.Ct. 1494. We do not doubt that Cisneros, like any criminal defendant, may raise separation of powers as a defense. *See Munoz–Flores*, 495 U.S. at 394, 110 S.Ct. 1964. But it scarcely follows that whenever a defendant relies on the separation-of-powers doctrine, the defendant's right must be treated as if it rested on an "explicit ... guarantee that trial will not occur." *Midland Asphalt Corp.*, 489 U.S. at 801, 109 S.Ct. 1494. Most separation-of-powers claims are clearly not in that category. *See, e.g., Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). A few may be. For instance, a trial court's order denying a President's claim of separation-of-powers immunity from civil actions during his term of office falls within the collateral order doctrine: the right asserted would be irretrievably lost if there could be no immediate appeal. *See Clinton*, 520 U.S. at 690, 117 S.Ct. 1636; *Jones v. Clinton*, 72 F.3d 1354, 1357 n. 4 (8th Cir.1996).

Nothing Cisneros argues amounts to a right not to be tried. He cannot point to anything guaranteeing him an immunity from standing trial. What he alleges is a constitutional affront flowing from an adjudication of materiality. This is not an affront to Cisneros personally. His complaint is aimed at a supposed infringement of the President's authority and of the Senate's. Yet trying him would not itself interfere with the President's nomination judgments or with the Senate's advise-and-consent function. During Cisneros's trial the President could continue nominating whomever he pleased, and the Senate could continue confirming, or refusing to confirm, those nominees for whatever reasons it saw fit. The short of the matter is that neither the President's nor the Senate's constitutional powers would be forever lost if Cisneros could appeal only after the jury returned its verdict.

For these reasons and others, Cisneros cannot bring his appeal within the jurisdictional holding of *United States v. Rose*, 28 F.3d 181 (D.C.Cir.1994), or the jurisdictional rulings in our two decisions following *Rose*—*United States v. Durenberger*, 48 F.3d 1239 (D.C.Cir.1995), and *United States v. Rostenkowski*, 59 F.3d 1291 (D.C.Cir.1995). The defendant in each of these cases was a member of the legislative branch when he committed the alleged wrongful act for which he was being tried.[5] *Rose*, a member of the

---

**5.** While *Rose* was a civil action, *Durenberger* and *Rostenkowski* were criminal proceedings. The court in *Rose* drew no distinction between the two types of proceedings. 28 F.3d at 186.

House of Representatives, defended against a civil penalty action for filing false financial reports with the Clerk of the House, in violation of the Ethics in Government Act of 1978. He appealed from the district court's orders denying his pretrial motion to dismiss the case. Rose's motion contended that forcing him to endure a trial would violate his Speech or Debate Clause immunity because the government planned to use his testimony before the House Committee on Standards of Official Conduct, which had investigated the matter. To the extent the district court order rejected this claim, it fell within a category of collateral orders recognized as immediately appealable, and we so held. 28 F.3d at 185. Rose also contended in the lower court that he had complete immunity from trial, under the separation of powers doctrine, because the Constitution gave each House the power to regulate the conduct of its members and because the House Committee had already investigated and sanctioned him. *Id.* at 184, 189–90. Rose's alleged right—his right to be free from having his conduct examined outside the House—was, we believed, closely akin to a claim of Speech or Debate Clause immunity. We therefore treated the order as immediately appealable. *Id.* at 186.

Implicit in *Rose,* and in our later jurisdictional holdings in *Durenberger* and *Rostenkowski,* was our recognition that the Speech or Debate Clause of Article I, § 6, manifested the Constitution's separation of powers. Designed to "prevent intimidation by the executive and accountability before a possibly hostile judiciary," the Speech or Debate Clause reinforces the separation of powers and protects legislative independence and integrity. *United States v. Johnson,* 383 U.S. 169, 181, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); *see also United States v. Brewster,* 408 U.S. 501, 524–25, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); *Gravel v. United States,* 408 U.S. 606, 616–17, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). It does so by conferring a personal privilege on individual legislators. *Brewster,* 408 U.S. at 524, 92 S.Ct. 2531. The argument in *Rose,* although ultimately rejected, 28 F.3d at 190, was that the separa-

tion-of-powers doctrine conferred on Rose an analogous and comparable privilege from having to defend his actions as a Congressman in a civil penalty suit. *Durenberger* and *Rostenkowski* are to the same effect. Like Rose, former Senator Durenberger claimed an immunity, based on separation of powers, from having to answer criminal charges depending, so he claimed, on the judiciary's usurpation of the Senate's exclusive rulemaking authority and statutory authority to make payments on vouchers conclusive. Quoting *Rose,* we found Durenberger's alleged right not to be tried sufficiently close to Speech or Debate Clause immunity and therefore allowed an immediate appeal of the district court's order denying his contentions. 48 F.3d at 1242. In *Rostenkowski* we first held that the former Congressman's appeal from the denial of his motion to dismiss the indictment was within the collateral order doctrine because he had claimed immunity under the Speech or Debate Clause. 59 F.3d at 1297. After explaining why orders denying immunity under the Clause were immediately appealable, we said that for "similar reasons" we would hear Rostenkowski's additional argument that his dismissal motion should have been granted on the ground that the separation of powers doctrine immunized him from being tried. *Id.*

Cisneros obviously cannot rely on the analogy to Speech or Debate Clause immunity we found persuasive in *Rose, Durenberger,* and *Rostenkowski.* During the period covered by Counts 2 to 17, Cisneros was a member of no branch of government.[6] His separation-of-powers contention rests on the proposition that the President has the sole discretion to decide what is important in making nomination decisions. Try as he might, Cisneros cannot stretch that claim into an immunity for prospective nominees from being tried for lying to the FBI during their background investigations. The immunity, if any, is the President's alone. And as we have said before, if there is merit to Cisneros's claim about judicial infringement on the President's (and the Senate's) prerogatives, and if the issue is finally determined at his trial,

---

6. There is some irony in the fact that the argument about judicial interference with the powers of the executive branch is offered as a defense to a prosecution brought by the executive branch for crimes arising out of an investigation conducted by the executive branch.

there will be time enough in an appeal from the final judgment to vindicate the separation of powers.

In short, the order refusing to dismiss Counts 2 through 17 is not a final decision under 28 U.S.C. § 1291 because it did not "conclusively determine" how the jury will be instructed on materiality and because Cisneros's separation-of-powers claim would not "be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand*, 437 U.S. at 468, 98 S.Ct. 2454.

### B.

The balance of the opinion discusses why the order, insofar as it refused to dismiss Count 1 and Count 18, also fails to come within the *Cohen* collateral order doctrine and thus may not be appealed prior to trial.

Count 1 charges Cisneros and others with having engaged in a conspiracy from the summer of 1992 through September 1994. The objects of the conspiracy were to defraud the United States by impeding the advise-and-consent function of the Senate, the function of the FBI in conducting background investigations pursuant to Executive Order No. 10450, and the function of the Department of Justice Personnel Security Office in determining whether Cisneros warranted a top secret national security clearance; and to violate § 1001, to obstruct pending Senate and Justice Department inquiries in violation of 18 U.S.C. § 1505, and to structure payments to Medlar in order to evade the financial reporting requirements contained in 31 U.S.C. § 5313(a). Among the overt acts alleged were: Cisneros's payments to Medlar during the conspiracy, including two separate cash payments of $8000 each on December 16 and 18, 1992 (breaking down cash transactions totaling over $10,000 into smaller sums for the purpose of evading the reporting requirement constitutes impermissible structuring, even if the transactions are conducted over the course of several days, *see* 31 C.F.R. § 103.11(gg)); telephone calls between Cisneros and Medlar; his liqui-

dation of an annuity account he maintained; a meeting between President-elect Clinton and Cisneros; Cisneros's completion of the SF–86 and a supplement thereto; his meetings with the FBI; his testifying before the Senate Banking Committee, which held his confirmation hearing; and his issuance of a press release in July 1994 stating that he had made no payments to Medlar since becoming HUD Secretary in January 1993 (the Indictment alleged he had paid her more than $70,000 during this period). All told, 64 separate overt acts are alleged.

While it is simple enough to understand why Cisneros believes the § 1001 charges (Counts 2–17) violate the separation of powers, it is no small feat to figure out why he thinks the same argument entitles him to an immediate appeal of the order refusing to dismiss Count 1.[7] It is true that one of the several objects of the conspiracy was to violate § 1001. Perhaps Cisneros believes he could be convicted of conspiring only if materiality were proven. If this is the basis for his claim of a right not to be tried on Count 1, then what we have already written disposes of the contention. Still, it is worth adding that on the face of the Indictment it is far from clear that even this single object of the conspiracy would necessarily require proof that Cisneros's false statements were material because they were capable of influencing the President and the Senate. Counts 19, 20, and 21 allege separate § 1001 violations by Cisneros's co-conspirators Rosales and Medlar. There is no contention that adjudicating the materiality of their false statements would impinge upon the prerogatives of the political branches. If the evidence showed that Cisneros conspired with Rosales and Medlar so that these two coconspirators would lie to the FBI, Cisneros would have no claim to separation-of-powers immunity, or at least no claim that he has made thus far. Furthermore, violating § 1001 is but one of many objects of the conspiracy alleged in the Indictment. With respect to some of the

7. Count 1 is not separately discussed in Cisneros's supplemental brief. The caption heading in Cisneros's opening brief—"COUNTS 1–17 ARE NONJUSTICIABLE BECAUSE THE COURTS MAY NOT INQUIRE INTO THE CRITERIA OR PROCEDURES USED BY THE PRESIDENT AND SENATE TO EVALUATE PROSPECTIVE CABINET OFFICERS"—is followed by page after page of text arguing that "counts 2–17" must be dismissed for this reason. *See, e.g.,* Brief for Appellant at 15, 24, 27, 32.

other objects of the conspiracy—to violate the anti-structuring law, for instance—we cannot imagine any viable separation-of-powers objection. For all these reasons, there is no basis whatever for treating the court's order refusing to dismiss Count 1 as a final decision. For all anyone knows, the evidence of conspiracy introduced at trial will have nothing whatever to do with anything Cisneros is attempting to have us decide in this appeal. *See supra* pp. 767–68.

■ To the extent the order refused to dismiss Count 18, it too is not appealable as a final decision. This count charges Cisneros with corruptly influencing and obstructing "the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States," 18 U.S.C. § 1505—the pending proceeding being the adjudication by the Justice Department of his security clearance. Cisneros has presented no argument focusing on Count 18 to explain why the denial of his motion to dismiss this count comes within the collateral order doctrine. Given the nature of this charge, his materiality contentions regarding Counts 2 through 17 simply do not apply. His argument for dismissing Count 18 was that the executive branch has sole and unreviewable authority to decide whether to issue security clearances; that the judiciary cannot determine the criteria used to award security clearances; and hence, the court could not determine whether his alleged deceits corruptly obstructed the Justice Department's determination. *See* Brief for Appellant at 42. The Executive Branch also "has exclusive authority and absolute discretion to decide whether to prosecute a case," *United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), but it would be absurd to suppose that anyone who was the subject of an agency investigation would, for that reason, have a right not to be tried for obstructing justice. *See United States v. Kelley,* 36 F.3d 1118, 1127 (D.C.Cir.1994). Cisneros's defense does not, in short, translate into an immunity from prosecution. Put differently, the district court's order refusing to dismiss Count 18 is not by any stretch "effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand,* 437 U.S. at 468, 98 S.Ct. 2454.

For the reasons given, the district court's order refusing to dismiss Counts 1 through 18 is not a "final decision" under 28 U.S.C. § 1291.

*Appeal dismissed.*