# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 17, 2006      Decided January 12, 2007

No. 05-7162

JOHN DOE, VILLAGE A, ACEH, INDONESIA, ET AL.,
APPELLEES

v.

EXXON MOBIL CORPORATION, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01357)

*Martin J. Weinstein* argued the cause for appellants. With him on the briefs were *Robert J. Meyer* and *Paul W. Wright*.

*Agnieszka M. Fryszman* argued the cause for appellees. With her on the brief were *Michael D. Hausfeld*, *Marka Peterson*, and *Terry Collingsworth*.

Before: SENTELLE and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

SENTELLE, *Circuit Judge*:  Exxon Mobil Corporation and several of its wholly-owned subsidiaries (hereinafter "Exxon") appeal from a district court order denying their motion to dismiss.  Exxon argues that the district court should have granted the motion to dismiss because the plaintiffs' claims are non-justiciable political questions.  We need not reach the merits of Exxon's arguments because we do not have jurisdiction over this appeal.  In the alternative, Exxon has requested that we treat its appeal as a petition for a writ of mandamus compelling the district court to dismiss these claims.  We deny this petition because Exxon has not established a "clear and indisputable" right to have the plaintiffs' claims dismissed.

## I.

Pursuant to a contract with the Indonesian government, Exxon operates a large natural gas extraction and processing facility in the Aceh province of Indonesia.  The plaintiffs-appellees are eleven Indonesian villagers from Aceh who allege that Exxon's security forces committed murder, torture, sexual assault, battery, false imprisonment, and other torts.  Plaintiffs allege that these security forces were comprised exclusively of members of the Indonesian military, and that Exxon retained these soldiers as guards for the natural gas facility even though Exxon was aware that the Indonesian army had committed human rights abuses in the past.  Plaintiffs also allege that these security forces acted under the "direction and control" of Exxon, and that Exxon provided "weapons, funding, military equipment, and other supplies" to these soldiers.

On June 11, 2001, the plaintiffs sued Exxon and PT Arun LNG Company (an unrelated entity) in United States District Court for the District of Columbia. Plaintiffs sought relief under the Alien Tort Statute and the Torture Victims Protection Act. They also brought common law tort claims for wrongful death,

assault, battery, arbitrary arrest and detention, false imprisonment, intentional and negligent infliction of emotional distress, negligence (in hiring and supervision), and conversion. Their complaint seeks compensatory and punitive damages, declaratory relief, attorneys' fees, and an injunction prohibiting the defendants from engaging in similar conduct in the future. The defendants did not answer the complaint; rather, in October 2001, they moved to dismiss the complaint on the grounds that the plaintiffs' claims are non-justiciable political questions.

While the motion to dismiss was pending, the district court solicited the State Department's opinion about whether adjudication of the plaintiffs' claims would interfere with U.S. foreign policy interests. On July 29, 2002, the Legal Adviser to the State Department filed a letter with the district court stating that this litigation "would in fact risk a potentially serious adverse impact on significant interests of the United States." In particular, the State Department was concerned that this suit would harm relations with Indonesia – a key ally in the war on terrorism – and that it would discourage foreign investment in Indonesia. However, the letter also stated that these potential effects on U.S.-Indonesian relations "cannot be determined with certainty." The letter noted that:

> Much of this assessment is necessarily predictive and contingent on how the case might unfold in the course of litigation. E.g., the nature, extent, and intrusiveness of discovery; the degree to which the case might directly implicate matters of great sensitivity to the Government of Indonesia ["GOI"] and call for judicial pronouncements on the official actions of the GOI with respect to the conduct of its military activities in Aceh; the effect that a decision in favor of plaintiffs might encourage secessionist activities in Aceh and elsewhere in Indonesia; whether the case were to go to a jury and, if so whether a substantial monetary

award were to be imposed on Exxon Mobil; how other large commercial interests might interpret such a judgment when making investment decisions in Indonesia.

The State Department also attached a letter from the Indonesian ambassador stating that Indonesia "cannot accept" a suit against an Indonesian government institution, and that U.S. courts should not be adjudicating "allegations of abuses of human rights by the Indonesian military." In July 2005, the State Department filed another letter expressing "concerns" about the initial discovery plan in this case; the plaintiffs' proposed discovery plan of May 16, 2005 involved relatively broad discovery that could extend to documents located in Indonesia.

On October 14, 2005, the district court issued an opinion and order granting in part and denying in part the motion to dismiss. *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005). First, the district court dismissed all of the plaintiffs' claims under the Alien Tort Statute and the Torture Victim Protection Act for failure to state a claim and for lack of subject matter jurisdiction. *Id.* at 24-28. These rulings are not challenged on appeal. Second, the district court dismissed all remaining claims against defendant PT Arun LNG Company, an entity that was 55% owned by the Indonesian government. *Id.* at 28. The court held that allowing litigation against this corporation would "create a significant risk of interfering in Indonesian affairs." *Id.* This ruling also is not challenged on appeal. Third, the district court denied Exxon's motion to dismiss the common law tort claims, holding that these claims did not present a non-justiciable political question. *Id.* at 29. However, the court emphasized that even though these claims were not dismissed, the parties must "tread cautiously" and conduct discovery "in such a manner so as to avoid intrusion into Indonesian sovereignty." *Id.* To that end, the district court

stated that it would exercise "firm control over any discovery conducted by plaintiffs." *Id.* The court concluded by noting:

> The issues and parties in this case have been tailored to a narrower question: did U.S. corporations in their effort to secure their pipeline in Indonesia violate U.S. state tort law? Litigation and discovery on this issue, if conducted with care, should alleviate the State Department's concerns about interfering with Indonesia's sovereign prerogatives while providing a means for plaintiffs to obtain relief through their garden-variety tort claims. It should be feasible, for instance, for plaintiffs to perpetuate testimony and satisfy document discovery requirements outside Indonesia.

*Id.* at 29-30.

Exxon filed an interlocutory appeal, contending that the district court should have dismissed the plaintiffs' common law tort claims as non-justiciable political questions.

## II.

Before we can consider the merits of Exxon's political question arguments, we must determine whether we have jurisdiction to hear this appeal. *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). We hold that Exxon's appeal does not fall within the narrow "collateral order" doctrine, and thus it must be dismissed for want of jurisdiction.

6

**A.**

Our appellate jurisdiction is defined by statute as follows: "The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . except where a direct review may be had in the Supreme Court."[1]  28 U.S.C. § 1291.  In general, a "final decision" is a district court order that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). However, the Supreme Court has held that the phrase "final decision" also encompasses a "small class" of district court orders that do not necessarily conclude the litigation, but do "finally determine claims of right separable from, and collateral to, rights asserted in the action." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).  Such orders are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.*  Courts have subsequently identified three requirements for invocation of the "collateral order doctrine."  In order to be immediately appealable, the order must: (1) "conclusively determine the disputed question";

---

[1]There are a few types of interlocutory appeals that are expressly permitted by statute, none of which are applicable in the instant case.  For example, 28 U.S.C. § 1292(a) provides for interlocutory appeals from: (1) orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to modify injunctions"; (2) orders appointing receivers or refusing to end a receivership; and (3) orders resolving certain issues in admiralty cases. Section 1292(b) permits circuit courts – in their discretion – to consider an interlocutory appeal when a district judge certifies that an order "involves a controlling question of law" and that "immediate appeal from the order may materially advance the ultimate termination of the litigation."

(2) "resolve an important issue completely separate from the merits of the action"; and (3) "be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). *See also United States v. Philip Morris, Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003).

In applying this three-factor test, the Supreme Court has *repeatedly* emphasized the narrowness of the collateral order doctrine. As the Court stated in a recent decision, "we have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope." *Will v. Hallock*, 126 S. Ct. 952, 958 (2006). Moreover, the Court has expressly stated that:

> [T]he "narrow" exception *should stay that way* and never be allowed to swallow the general rule . . . that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated.

*Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) (emphasis added). Clarity is also an important consideration in collateral order cases: "the issue of appealability under § 1291 is to be determined for the entire category to which a claim belongs, without regard to the chance that the litigation at hand might be speeded, or a 'particular injustic[e]' averted . . . by a prompt appellate court decision." *Id.* (internal citations omitted). The Court summarized its approach to the collateral order doctrine by noting that "we have meant what we said; although the Court has been asked many times to expand the 'small class' of collaterally appealable orders, we have instead kept it narrow and selective in its membership." *Will*, 126 S. Ct. at 958.

**B.**

The issue before us in the instant case is whether a district court's denial of a defendant's motion to dismiss on political question grounds is an immediately appealable collateral order.

At the outset, we note that the first two requirements for invocation of the collateral order doctrine are satisfied in this case. The district court "conclusively determine[d]" the political question issue by denying Exxon's motion to dismiss and allowing the litigation to proceed. *Exxon Mobil Corp.*, 393 F. Supp. 2d at 29. Nothing in the court's opinion suggests that its determinations were tentative or subject to revision. The political question issue is also "an important issue completely separate from the merits" of the plaintiffs' tort claims. In *Mitchell v. Forsyth,* 472 U.S. 511, 527-28 (1985), the Supreme Court held that the defendant's claim of qualified immunity was "separate from the merits" of the plaintiff's suit for unlawful wiretapping. The Court noted that it could resolve the qualified immunity issue without considering "the correctness of the plaintiff's version of the facts, nor even determin[ing] whether the plaintiff's allegations actually state a claim." *Id*. at 528. The instant case is no different; the political question issue can be resolved without any consideration of the merits of the plaintiffs' common law tort claims.

Thus, we turn to the third requirement of the collateral order doctrine, which is whether the order in question will be "effectively unreviewable on appeal from final judgment." *Coopers & Lybrand*, 437 U.S. at 468. An order is "effectively unreviewable" after final judgment if it involves "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Midland Asphalt Corp v. United States*, 489 U.S. 794, 798 (1989) (quoting *United States v. MacDonald*, 435 U.S. 850, 860 (1978)). Many of the cases in

which courts have found this requirement to be satisfied have involved a district court's denial of a claim of immunity or double jeopardy. Such cases satisfy the third requirement of the collateral order doctrine because they involve the rejection of a defense that would have allowed the defendant to *avoid trial altogether.* More specifically, the doctrines of qualified immunity and absolute immunity do not just protect covered individuals from judgments; they also provide protection from "the risks of trial – distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Mitchell*, 472 U.S. at 526 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)) (qualified immunity). *See also Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (absolute immunity); *United States v. Rostenkowski*, 59 F.3d 1291, 1297 (D.C. Cir. 1995) (Speech and Debate Clause immunity and separation of powers immunity). Similarly, the Supreme Court has held that a district court's denial of a claim of state sovereign immunity is immediately appealable because the Eleventh Amendment grants non-consenting states a right to be free from trial: "The very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142-47 (1993) (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)). Courts have also allowed immediate appeals from denials of double jeopardy claims because the Double Jeopardy Clause grants defendants a right to be *free from trial* if they have already been tried for the same offense. *See Abney v. United States*, 431 U.S. 651, 660-61 (1977) (noting that the Double Jeopardy Clause protects defendants against "the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense").

We do not mean to suggest that a claim of a "right to avoid trial" is inherently sufficient to meet the third requirement of the collateral order doctrine. If parties could take an immediate appeal every time they asserted a "right to avoid trial," this would "leave the final order requirement of § 1291 in tatters." *See Will*, 126 S. Ct. at 958. It would allow immediate appeal from all district court orders regarding personal jurisdiction, statutes of limitation, claim preclusion, the right to a speedy trial, and many other types of motions. *Id. See also Digital Equip. Corp.*, 511 U.S. at 873 (noting that "virtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a 'right not to stand trial'"). Thus, the Supreme Court has *also* required that the "interest in avoiding trial" must be buttressed by "some particular value of a high order," such as "honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, respecting a State's dignitary interests, [or] mitigating the government's advantage over the individual." *Will*, 126 S. Ct. at 959.

Here, Exxon has not established that the political question doctrine confers a "right not to stand trial" that can justify an immediate appeal. Exxon asserts that interlocutory review of the district court's political question holding is necessary to protect the executive branch from judicial intrusion into sensitive foreign policy matters; it argues that any such intrusion will be effectively unreviewable on appeal from final judgment. In *Will*, the Supreme Court did identify "honoring the separation of powers" as a value that could support a party's interest in avoiding trial. *Id.* However, when the Court mentioned the separation of powers as a value that supported the "right to avoid the burdens of trial," it *only* did so while discussing cases involving immunity. *See id.* (quoting *Nixon*, 457 U.S. at 743, 749). As explained above, claims of immunity have long been held to fall within the collateral order doctrine. Thus, although

*Will* did refer to the separation of powers as a "value of a high order," that case does not support the broad principle that all district court orders that reject separation of powers defenses are immediately appealable under the collateral order doctrine.

Moreover, this Court has expressly held that a party is not entitled to an appeal every time a district court denies a motion to dismiss based upon the separation of powers. In *United States v. Cisneros*, 169 F.3d 763, 764-66 (D.C. Cir. 1999), a former cabinet official – Henry Cisneros – was indicted for allegedly providing false information to the FBI during a background investigation. Cisneros moved to dismiss several counts of indictment on the grounds that "the separation of powers doctrine precludes the Judicial Branch from considering what information would be capable of influencing the President or the Senate in evaluating prospective cabinet officers." *Id.* at 766. The district court denied the motion to dismiss, holding that the prosecution of Cisneros would not "impermissibly intrude[] upon the prerogatives of the executive and legislative branches to nominate and confirm prospective Cabinet members." *Id.* Cisneros immediately appealed the district court's decision, but this Court held that it did not have jurisdiction over the appeal under the collateral order doctrine. *Id.* at 767-71. Like Exxon in the instant case, Cisneros argued that he had a "right not to be tried" because the "very conduct of the trial itself will violate the separation of powers by causing the courts to invade the exclusive constitutional province of the coordinate branches." *Id.* at 769. This Court easily rejected Cisneros' argument:

> We do not doubt that Cisneros, like any criminal defendant, may raise separation of powers as a defense. . . . But it scarcely follows that whenever a defendant relies on the separation-of-powers doctrine, the defendant's right must be treated as if it rested on an "explicit . . . guarantee that

> trial will not occur." *Midland Asphalt Corp.*, 489 U.S. at 801. Most separation-of-powers claims are clearly not in that category.

*Id.* (internal citations omitted). This Court acknowledged that "a few" separation of powers claims may be immediately appealable, but it only specifically referred to claims based on immunity. *Id.* Given that Cisneros' separation of powers arguments were not based upon "an immunity from standing trial," this Court held that it did not have jurisdiction over the appeal under the collateral order doctrine. *Id.* at 769-70. Thus, in *Cisneros* this Court made clear that – outside the context of immunity – a defendant is not entitled to an appeal from a district court order denying a motion to dismiss based on the separation of powers.[2] Just so here. Simply invoking a separation of powers defense does not permit Exxon to pursue an otherwise impermissible appeal.

Exxon has not directed us to – nor have we found – a single case in which a federal appeals court held that denial of a motion to dismiss on political question grounds is an immediately appealable collateral order. Exxon relies heavily upon *Rostenkowski* and *767 Third Avenue Associates v. Consulate General of Yugoslavia*, 218 F.3d 152 (2d Cir. 2000). Both of these cases are inapposite. In *Rostenkowski*, the defendant – a former Congressman – was indicted for misappropriation of congressional funds, and as a defense to his prosecution, he argued that he was protected by Speech and Debate Clause immunity and by general separation of powers immunity.

---

[2] Although *Cisneros* was a "separation of powers" case, it is still highly relevant to the instant case because the political question doctrine is "primarily a function of the separation of powers." *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) (quoting *Baker v. Carr*, 369 U.S. 186, 210 (1962)).

*Rostenkowski*, 59 F.3d at 1294-97. The district court denied his claims of immunity, and Rostenkowski sought immediate appeal. This Court held that it had jurisdiction over the appeal under the collateral order doctrine. *Id.* at 1297. However, as discussed above, courts have long held that parties may immediately appeal from the denial of immunity claims, given that immunity confers a right to be free from the burden of litigation. *Rostenkowski* is simply a case that turns on the interlocutory appealability of immunity determinations; it does not support the broad principle that all political question determinations are immediately appealable. Exxon further argues that in *Rostenkowski*, this Court addressed the merits of a political question issue regarding the Rulemaking Clause, even though the district court denied Rostenkowski's motion to dismiss on these grounds. *See id.* at 1304-12. However, this Court did not in any way address the interaction between the collateral order doctrine and the political question doctrine. It is a well-established principle of interpretation that courts are "not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952). *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984); *Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974).

The Second Circuit's decision in *767 Third Avenue Associates* is also of no help to Exxon. In that case, the court held that an "abstention-based stay order" is a "final decision" under § 1291, and thus the plaintiffs may immediately appeal such an order. 218 F.3d at 159. The case does mention the political question doctrine, but only by noting that the district court's stay order was based upon political question concerns. *Id.* The only issue on appeal in *767 Third Avenue Associates* was whether it was proper for the district court to grant the stay. The case does not address whether a denial of a motion to

dismiss based on political question grounds falls within the collateral order doctrine.

Finally, Exxon also argues that the political question issue will be effectively unreviewable after final judgment because during the course of this litigation, Exxon may be compelled to produce documents or information that are protected from disclosure under Indonesian law. Exxon contends that these disclosures may violate Indonesian law and subject the company and its officers to fines, imprisonment, and loss of business. *See* Appellant's Br. 22-23. However, in its discovery order of May 3, 2006, the district court stated that Exxon would be required to produce documents located in Indonesia only "after any necessary authorization" from the Indonesian government. In other words, during discovery Exxon will not be compelled to produce any documents against the wishes of the government of Indonesia. Thus, Exxon's concerns about being subjected to penalties for unauthorized disclosures are baseless.

In sum, we hold that we do not have jurisdiction over Exxon's appeal under the collateral order doctrine. Were we to allow defendants to appeal every time a district court denied a motion to dismiss based upon political question grounds, we would be substantially expanding the scope of the collateral order doctrine. This would be directly contrary to the Supreme Court's statements that the doctrine is "narrow and selective" and "should never be allowed to swallow the general rule . . . that a party is entitled to a single appeal, to be deferred until final judgment." *See Will*, 126 S. Ct. at 957-58. We hold that the denial of a motion to dismiss based upon political question grounds is not an immediately appealable collateral order. Thus, Exxon's appeal must be dismissed for want of appellate jurisdiction.

**III.**

In the alternative, Exxon requests that we treat its appeal as a petition for a writ of mandamus. A writ of mandamus is available "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296, 308 (1989) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). Courts will issue the writ only if the petitioners' right to relief is "clear and indisputable" and if the petitioners "lack adequate alternative means to obtain the relief they seek." *Id.* at 309. *See also In re Sealed Case*, 141 F.3d 337, 339 (D.C. Cir. 1998). This Court has emphasized that "[m]andamus is an extraordinary remedy 'reserved for really extraordinary cases.'" *In re Bituminous Coal Operators Ass'n*, 949 F.2d 1165, 1167 (D.C. Cir. 1991) (quoting *Ex parte Fahey*, 332 U.S. 258, 260 (1947)). Moreover, it is well settled that mandamus "is not to be used as a substitute for appeal . . . even though hardship may result from delay and perhaps unnecessary trial." *Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964) (internal citations omitted). *See also In re GTE Serv. Corp.*, 762 F.2d 1024, 1026-27 (D.C. Cir. 1985). In order to grant Exxon's petition for mandamus, we would have to hold that the district court "clearly and indisputabl[y]" exceeded its jurisdiction by refusing to dismiss this case under the political question doctrine. We cannot so hold.

At the outset, we note that the district court has taken several steps to limit the scope of this litigation. For example, the court dismissed the plaintiffs' claims against a natural gas company that was partially owned by the Indonesian government because including this entity as a party would "create a significant risk of interfering in Indonesian affairs and thus U.S. foreign policy concerns." *Exxon Mobil Corp.*, 393 F. Supp. 2d at 28. Likewise, the district court has greatly curtailed

discovery in this case; for example, Exxon will not be required to produce documents from its Indonesian operations unless it receives all "necessary authorizations" from the Indonesian government. The district court imposed this limitation to ensure that there would be no discovery of documents that the Indonesian government deems classified or confidential.

We disagree with Exxon's contention that there is a conflict between the views of the State Department and those of the district court. In a letter dated July 29, 2002, the Legal Adviser of the State Department noted that adjudication of the plaintiffs' claims would "risk a potentially serious adverse impact on significant interests of the United States." However, the letter also contained several important qualifications. It noted that the effects of this suit on U.S. foreign policy interests "cannot be determined with certainty." Moreover, the letter stated that its assessment of the litigation was "necessarily predictive and contingent on how the case might unfold in the course of litigation." Most importantly, the State Department emphasized that whether this case would adversely affect U.S. foreign policy depends upon "the nature, extent, and intrusiveness of discovery." We interpret the State Department's letter not as an unqualified opinion that this suit must be dismissed, but rather as a word of caution to the district court alerting it to the State Department's concerns. Indeed, the fact that the letter refers to "how the case might unfold in the course of the litigation" shows that the State Department did not necessarily expect the district court to immediately dismiss the case in its entirety. Thus, we need not decide what level of deference would be owed to a letter from the State Department that *unambiguously* requests that the district court dismiss a case as a non-justiciable political question. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (suggesting that when the State Department files a statement of interest "there is a strong argument that federal courts should give serious weight to the Executive

Branch's view of the case's impact on foreign policy"). Of course, if we have misinterpreted this letter, or if the State Department has additional concerns about this litigation, it is free to file further letters or briefs with the district court expressing its views. *Cf. Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004) (noting that "nothing in our holding prevents the State Department from filing statements of interest suggesting that courts decline to exercise jurisdiction in particular cases implicating foreign sovereign immunity"). But given the letter before us in the record, we cannot say it is "indisputable" that the district court erroneously failed to dismiss the plaintiffs' claims under the political question doctrine, no matter what level of deference is owed to the State Department's letter.

We note that several other circuits have refused to invoke the political question doctrine to dismiss claims that were very similar to those in the instant case. For example, in *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069 (9th Cir. 2006), the Ninth Circuit held that the political question doctrine does not bar litigation of a tort suit by Papua New Guinean villagers against an international mining company. In *Sarei*, the plaintiffs alleged that the mining company used the Papau New Guinean military to quell an uprising that threatened the mines; many civilians were killed or injured during this operation. *Id.* at 1075. The district court dismissed the case on political question grounds, but the Ninth Circuit reversed, holding that the suit did not present a non-justiciable political question. *Id.* at 1079-84. The court emphasized that this was simply a tort suit – which is constitutionally committed to the judiciary – and that there was no reason to suspect that the suit would "infring[e] on the prerogatives" of the executive branch. *Id.* at 1079-82. In *Sarei* (like the instant case), the State Department filed a letter expressing concerns about the case, but the Ninth Circuit noted that this letter was "guarded," and held that "we are confident

that proceeding does not express any disrespect for the executive, even if it would prefer that the suit disappear." *Id.* at 1082-83.

Similarly, in *Linder v. Portocarrero*, 963 F.2d 332 (11th Cir. 1992), the plaintiffs brought common law tort claims against several Nicaraguan individuals and groups, alleging that these defendants tortured and killed one of their relatives during the Nicaraguan civil war. The Eleventh Circuit held that the claims against "military and political" groups must be dismissed, but that the remaining claims – against private individuals – were not barred by the political question doctrine. *Id.* at 337. *See also Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 279-82 (1st Cir. 2005) (holding that a tort suit by victims of terrorism against the PLO does not present a non-justiciable political question).

Although the aforementioned cases are not binding on this Court because they are from other circuits, they do demonstrate that Exxon has not established a "clear and indisputable" right to have the plaintiffs' claims dismissed as non-justiciable. Exxon cites no cases in which a federal court has held that, in a matter involving like issues and comparable circumstances (*i.e.*, claims by a private party against a private United States corporation), the complaint *must* be dismissed under the political question doctrine. And we are aware of no such authority.

In its brief, Exxon asserts that *Ex parte Republic of Peru*, 318 U.S. 578, 586-87 (1943), holds that mandamus is appropriate for cases that involve "the dignity and rights of a friendly sovereign state, claims against which are normally presented and settled in the course of the conduct of foreign affairs by the President and by the Department of State." However, that case is inapposite for several reasons. First, in *Republic of Peru,* the district court had refused to dismiss an *in*

*rem* claim against a Peruvian vessel even though the State Department and the government of Peru had reached a negotiated solution to this dispute. *Id.* at 799. The Supreme Court noted that:

> When the Secretary [of State] elects . . . to settle claims against the vessel by diplomatic negotiations between the two countries rather than by continued litigation in the courts, it is of public importance that the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings in the district court.

*Id.* at 587. Thus, in *Republic of Peru*, continued litigation might have upset a negotiated settlement between the State Department and a foreign sovereign. In the instant case, however, there has been no settlement of the plaintiffs' claims by the political branches that would be disrupted by litigation in the district court. Moreover, the Supreme Court stated:

> That principle is that courts may not so exercise their jurisdiction, *by the seizure and detention of the property of a friendly sovereign*, as to embarrass the executive arm of the government in conducting foreign relations.

*Id.* at 588 (emphasis added). *Republic of Peru* was an *in rem* adjudication regarding a ship that was owned by a *foreign sovereign*. In contrast, the instant case involves only tort claims by private plaintiffs against a private corporation; the government of Indonesia is not a party to the suit, and none of its property would be affected by the district court's adjudication of this case. Thus, the *Republic of Peru* case provides little, if any, support for Exxon's contention that it is entitled to a writ of mandamus.

Exxon also relies upon *In re Austrian & German Holocaust Litigation*, 250 F.3d 156 (2d Cir. 2001), for the proposition that mandamus is appropriate "in a matter bearing on United States foreign policy" that presents "separation of powers concerns." This case also does little to support Exxon's position. In the *Holocaust Litigation* case, the district court had dismissed several Holocaust-related claims against German and Austrian defendants; however, the dismissal was contingent upon further actions being taken that would allow those claims to proceed in an international settlement process. *Id.* at 163-65. The Second Circuit issued a writ of mandamus and vacated two portions of the district court's order. First, the court held that:

> Paragraph 4(b) [of the district court's order] seemingly requires the German legislature to make a finding of legal peace and to do so before its summer recess. It would be beyond the authority of the court so to trammel on the prerogatives of a legislature in the United States. Much less does the court have the power to require such actions of the legislature of a foreign sovereign.

*Id.* at 164. Additionally, the court held that:

> The last sentence of paragraph 7 appears to indicate that if the German legislature failed to change German law, the district court could or would vacate these dismissals. It is not the office of the court, however, to decide what legislation should be enacted; and the refusal of a legislature, within the scope of its own authority, to enact or change a law is not a valid ground for vacatur of a final judgment.

*Id.* at 165. Thus, in the *Holocaust Litigation* case, the Second Circuit issued a writ of mandamus because the district court lacked authority "to dictate to legislatures what laws shall be passed." *Id.* This is a far cry from the order being challenged in the instant case, in which the district court allowed a common law tort suit to proceed against a private defendant.

In conclusion, although we need not resolve the political question issue on the merits at this time, we hold that Exxon has not established a "clear and indisputable" right to have the plaintiffs' claims dismissed. In so doing, we note that we have entered no holding inconsistent with our dissenting colleague's doctrinal views on deference owed the executive in matters of foreign policy. None of the cases cited by our colleague stand for the proposition that we should grant a mandamus for which the executive has not prayed. As we noted above, the State Department emphasized in its communications with the district court that "whether this case would adversely affect U.S. foreign policy depends upon 'the nature, extent, and intrusiveness of discovery.'" *See* page 16, *supra*. Since that correspondence the district court has dismissed some claims and limited discovery. Since that limitation, the State Department has made no further request of the district court, and has never requested the dismissal of the action against Exxon. The executive did not intervene to seek this mandamus, nor join the petition for mandamus filed by Exxon. Had the executive taken any of these measures, then the question raised by our dissenting colleague would have been before the district court. On the present record, however, the issue before us is whether Exxon is entitled to mandamus at this time. For the reasons set forth above, we are not able to say that Exxon has "clearly and indisputably" established a right to the relief it seeks. Accordingly, Exxon's petition for a writ of mandamus is denied.

## IV.

We hold that Exxon's appeal does not fall within the narrow "collateral order" doctrine, and therefore, this appeal must be dismissed for want of jurisdiction. We also deny Exxon's request, in the alternative, for a writ of mandamus because Exxon has not established a "clear and indisputable" right to have these claims dismissed under the political question doctrine.

*So ordered*.

KAVANAUGH, *Circuit Judge*, dissenting: I respectfully dissent. In my judgment, allowing this lawsuit to proceed is inconsistent with bedrock principles of judicial restraint that the Supreme Court and this Court have articulated in cases touching on the foreign policy and foreign relations of the United States.

Citing the Alien Tort Statute and international law (and in some cases also state law and the Torture Victim Protection Act of 1991), foreign citizens have begun bringing human rights lawsuits against multinational corporations in U.S. courts. *See, e.g.*, *Doe v. Unocal Corp.*, 963 F. Supp. 880, 883-84 (C.D. Cal. 1997) (considered to be first such case). The complaints often allege corporate complicity in various human rights violations committed by foreign government officials against foreign citizens in foreign countries (some cases allege direct corporate wrongdoing not involving foreign government officials). Particularly because many of these lawsuits directly or indirectly target actions of foreign government officials, they frequently raise sensitive foreign policy issues for the United States.

In this case, 11 Indonesian citizens sued Exxon; plaintiffs claim they were injured in Indonesia by members of the Indonesian military who provide security for Exxon in Indonesia. The Government of Indonesia has objected to the case as an intrusion on its sovereignty. And the Executive Branch has stated that the lawsuit will adversely affect the foreign policy interests of the United States – particularly U.S. relations with Indonesia, which is the largest Muslim nation in the world and has worked closely with the United States since September 11, 2001, in the ongoing war against al Qaeda and related radical Islamic terrorist organizations. In a lengthy letter, the State Department's Legal Adviser explained to the District Court how "adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism." Under the precedents of the Supreme Court –

including *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) – and decisions of this Court, the federal courts give deference to reasonable explanations by the Executive Branch that a civil lawsuit would adversely affect the foreign relations of the United States, and the courts dismiss such cases as non-justiciable political questions. Given those precedents and the State Department's reasonable explanation of how this litigation would harm U.S. interests, we should grant the petition for a writ of mandamus and order dismissal of plaintiffs' complaint.

I

Exxon Mobil Corporation's Indonesian subsidiary maintains a large natural gas facility in the Aceh Province of Indonesia. The Province has endured violence as a result of internal tensions between separatists in that region and the Government of Indonesia. To protect its Indonesian natural gas operations, Exxon entered into a contract with Indonesia's state-owned oil and gas company in which members of the Indonesian military would work as security personnel at Exxon's facility.

Plaintiffs in this case are Indonesian citizens who reside in the Aceh Province. They allege they were injured by Indonesian military personnel who worked for Exxon. In 2001, plaintiffs sued Exxon in the U.S. District Court for the District of Columbia to recover for those injuries. Plaintiffs brought claims against Exxon under the Alien Tort Statute and international law, the Torture Victim Protection Act, and state tort law. Plaintiffs asserted the same claims against PT Arun LNG Company, a natural gas entity that Exxon and the Indonesian government jointly own.

The fourth largest nation in the world (and the largest Muslim nation), Indonesia has been a key partner of the United States since September 11, 2001, in the ongoing war against al Qaeda and related radical Islamic terrorist organizations. This case – which alleges that Indonesian military personnel injured Indonesian citizens in Indonesia – has triggered serious objections from the Government of Indonesia about intrusion on its sovereignty. The State Department has carefully considered Indonesia's concerns and how the lawsuit might adversely affect U.S. interests. In 2002, the Legal Adviser for the State Department informed the District Court that "adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism." Deferred Appendix (D.A.) at 182. The State Department "anticipate[d] that adjudication of this case will be perceived in Indonesia as a U.S. court trying the GOI for its conduct of a civil war in Aceh." D.A. 183. In the Department's view, "[t]he Indonesian response to such perceived U.S. 'interference' in its internal affairs could impair cooperation with the U.S. across the full spectrum of diplomatic initiatives, including counterterrorism, military and police reform, and economic and judicial reform." D.A. 183-84. The State Department explained:

> This lawsuit could potentially disrupt the on-going and extensive United States efforts to secure Indonesia's cooperation in the fight against international terrorist activity. Indonesia is the fourth largest state in the world, with a population of some 210 million. It is also the largest Muslim nation, and serves as a focal point for U.S. initiatives in the ongoing war against Al Qaida and other dangerous terrorist organizations. U.S. counter-terrorism initiatives could be imperiled in numerous ways if Indonesia and its officials curtailed

cooperation in response to perceived disrespect for its sovereign interests.

D.A. 184. The State Department further stated that the litigation "may also diminish our ability to work with the Government of Indonesia ('GOI') on a variety of important programs, including efforts to promote human rights in Indonesia." D.A. 182. The Department also noted that "[t]his litigation appears likely to further discourage foreign investment" in Indonesia, which "in turn, could have decidedly negative consequences for the Indonesian economy"; if a downturn in Indonesia's economy were to "breed instability it would adversely affect U.S. interests." D.A. 185. In addition, the Department stated that the suit could have a negative impact on U.S. diplomatic objectives throughout the region, on U.S. businesses, and on the international economy.

The State Department supported its statement with a letter sent by the Indonesian Ambassador to the Deputy Secretary of State: "As a matter of principle, we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution, . . . the Indonesian military, for operations taking place in Indonesia." D.A. 188.

In July 2005, the State Department's Legal Adviser reiterated the concerns first expressed in 2002, informing the District Court that "the concerns set forth in the State Department letter of July 2002 . . . remain valid today." D.A. 244. Along with the State Department's 2005 letter, the State Department also submitted a letter from the Indonesian Embassy reiterating the concerns the Government of Indonesia first expressed in 2002.

In October 2005, largely in response to the State Department's submissions, the District Court dismissed

plaintiffs' federal-law claims against Exxon and dismissed all claims against PT Arun LNG Company. In dismissing the federal-law claims against Exxon, the District Court relied on the State Department's statement that "'adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism.'" *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 22 (D.D.C. 2005) (quoting State Department's 2002 Statement of Interest). The District Court reasoned that "determining whether defendants engaged in joint action with the Indonesian military necessarily would require judicial inquiry into precisely what the two parties agreed to do" and "such an inquiry cuts too close to adjudicating the actions of the Indonesian government." *Id.* at 27.

Although it dismissed the *federal*-law claims, the District Court did not dismiss plaintiffs' *state*-law tort claims against Exxon. The District Court stated that litigation and discovery on the state-law claims, "if conducted with care, should alleviate the State Department's concerns about interfering with Indonesia's sovereign prerogatives while providing a means for plaintiffs to obtain relief through their garden-variety tort claims." *Id.* at 30.

Exxon has filed an interlocutory appeal of the District Court's denial of Exxon's motion to dismiss the state-law tort claims. Exxon requests that we entertain its interlocutory appeal under the collateral order doctrine or, in the alternative, that we issue a writ of mandamus requiring dismissal of the state-law tort claims.

6

II

1.  A civil lawsuit in a U.S. court involving a foreign government, foreign officials, or foreign interests may adversely affect relations between the United States and the foreign nation. Such cases therefore pose sensitive separation of powers issues for the Judiciary because the Constitution assigns the Executive and Legislative Branches primary authority over the foreign policy and foreign relations of the United States. *See, e.g., Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.") (internal quotation omitted); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.  Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) ("As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities.") (internal quotation omitted); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) ("The President is the sole organ of the nation

in its external relations, and its sole representative with foreign nations.") (internal quotation omitted).

As the courts therefore have recognized, lawsuits that would adversely affect the foreign policy of the United States can pose non-justiciable political questions. *See Baker v. Carr*, 369 U.S. 186, 211 (1962) (Regarding foreign policy issues: "Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views."); *Bancoult v. McNamara*, 445 F.3d 427, 435 (D.C. Cir. 2006) (describing "topics that serve as the quintessential sources of political questions: national security and foreign relations"); *Hwang Geum Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005) ("The Executive's judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjusticiable under the political question doctrine."); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 (D.C. Cir. 1984) (Bork, J., concurring) ("Questions touching on the foreign relations of the United States make up what is likely the largest class of questions to which the political question doctrine has been applied.").

Courts are not well-equipped to determine on their own, however, whether a particular civil case would have a negative impact on U.S. foreign policy and should be dismissed. In part for that reason, as the Supreme Court has instructed, courts give deference to the Executive Branch when the Executive reasonably explains that adjudication of a particular civil lawsuit would adversely affect the foreign policy interests of the United States. *See, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (regarding suits involving private parties: "[T]here

is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy."); *Republic of Austria v. Altmann*, 541 U.S. 677, 702 (2004) ("[S]hould the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy.") (emphasis in original); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 366, 386 (2000) (regarding state legislation regulating foreign commerce with Burma: "[R]epeated representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state Act stands in the way of Congress's diplomatic objectives."); *cf. Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003) (citing letters from State Department explaining harm to foreign policy caused by state law); *Regan*, 468 U.S. at 243 (referring to "the traditional deference to executive judgment" in foreign policy matters); *Ex parte Republic of Peru*, 318 U.S. 578, 588 (1943) (courts should not exercise their jurisdiction "as to embarrass the executive arm of the government in conducting foreign relations").

Deference to the Executive Branch's position on the foreign policy implications of a lawsuit traditionally has occurred in cases directly against foreign governments or foreign government officials. *See, e.g.*, *Ex parte Peru*, 318 U.S. at 588; *Hwang Geum Joo*, 413 F.3d at 48; *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 59-60 (2d Cir. 2005) (citing *Altmann*, 541 U.S. at 702, and *Sosa* footnote 21 and deferring to State Department Statement of Interest in ordering dismissal of suit against Republic of Austria). Beginning in 1980, the category of cases potentially raising foreign policy concerns expanded as a result of the Second Circuit's decision in

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). That case held that, under the Alien Tort Statute, foreign citizens can sue foreign government officials for international law violations committed in foreign countries. *See id.* at 878, 887; *cf. Tel-Oren*, 726 F.2d at 775, 792 (Edwards, J., concurring); *id.* at 799, 812-16 (Bork, J., concurring); *id.* at 823 (Robb, J., concurring).

In recent years, foreign citizens have taken *Filartiga* a step further (and in some cases also cited the 1991 Torture Victim Protection Act) and begun to sue multinational corporations in U.S. courts – often alleging corporate complicity in human rights violations committed by foreign government officials against foreign citizens in foreign countries. *See generally* Beth Stephens, Sosa v. Alvarez-Machain*: "The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts*, 70 BROOK. L. REV. 533, 537-38 (2005). Although those cases nominally target corporations and not foreign government officials, federal courts have recognized that the suits still can adversely affect U.S. foreign policy interests. Several federal district courts therefore have applied traditional justiciability principles to this new category of cases against corporations, including deference to the Executive Branch as appropriate. *See, e.g.*, *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wash. 2005) ("This case must also be dismissed because it interferes with the foreign policy of the United States of America. . . . For this court to preclude sales of Caterpillar products to Israel would be to make a foreign policy decision and to impinge directly upon the prerogatives of the executive branch of government."); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1194 (C.D. Cal. 2005) ("[T]he State Department has filed a Statement of Interest outlining several areas of foreign policy that would be negatively impacted by proceeding with the instant case. . . . [P]roceeding with the litigation would indicate a 'lack of respect' for the Executive's preferred

approach of handling the Santo Domingo bombing and relations with Colombia in general."); *In re Nazi Era Cases Against German Defendants Litig.*, 334 F. Supp. 2d 690, 695-96 (D.N.J. 2004) ("[T]he political question doctrine counsels the Court to dismiss this action. . . . If this Court adjudicated the Complaint, it would do so against the recommendation of the Executive Branch."); *id.* at 695 ("[A]llowing private litigation of war-related claims would express a lack of respect for the executive branch.") (quoting *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 486 (D.N.J. 1999)); *Iwanowa*, 67 F. Supp. 2d at 486 ("The executive branch has always taken the position that claims arising out of World War II must be resolved through government-to-government negotiations. Thus, allowing private litigation of war-related claims would express a lack of respect for the executive branch.").

In its 2004 decision in *Sosa*, the Supreme Court confirmed that traditional justiciability principles apply to the new category of cases brought by foreign citizens against multinational corporations. The Court took note of the growing litigation against multinational corporations (and recognized the concerns about such litigation). Although the defendant in *Sosa* was a foreign official and not a corporation, the Supreme Court pro-actively suggested that, for purposes of applying standard justiciability principles, there is no distinction between (i) suits directly against foreign governments or officials and (ii) suits against non-governmental entities that nonetheless may affect U.S. relations with foreign governments. The Court outlined a "policy of case-specific deference to the political branches" to "several class actions seeking damages from various corporations." *Sosa*, 542 U.S. at 733 n.21. The Court stated: "[T]here is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Id.* (citing *Altmann*, 541 U.S. at 701-02); *cf. Garamendi*, 539 U.S. at 415-16 ("The executive

agreements at issue here do differ in one respect from those just mentioned insofar as they address claims associated with formerly belligerent states, but against corporations, not the foreign governments. But the distinction does not matter. Historically, wartime claims against even nominally private entities have become issues in international diplomacy . . . ."); *Crosby*, 530 U.S. at 386 (Court "acknowledged that the nuances of the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court" in litigation challenging state legislation regulating private corporations engaged in foreign commerce) (internal quotation omitted).

In the wake of *Sosa*, the lower federal courts properly give "serious weight" to Executive Branch statements of interest in human rights cases brought against multinational corporations. *See Sosa*, 542 U.S. at 733 n.21. Of course, serious weight does not mean conclusive weight. Judicial deference to the Executive Branch regarding the foreign policy implications of a civil lawsuit does not mean judicial abdication. It is not enough, therefore, for the Executive Branch merely to assert harm; rather, the harm must be explained – and explained reasonably. In other words, as in other cases involving Executive Branch statements about the adverse impact on U.S. foreign policy interests, the fundamental question for the Judiciary is whether the Executive Branch has reasonably explained that the litigation would adversely affect the foreign policy interests of the United States. *Cf. Hwang Geum Joo*, 413 F.3d at 48, 52.

This Court's decision in *Hwang Geum Joo* exemplifies proper application of those traditional justiciability principles. In that case, 15 women from China, Taiwan, South Korea, and the Philippines sued Japan under the Alien Tort Statute for international law violations. *Id.* at 46. The plaintiffs alleged that Japanese soldiers had subjected them to torture before and

during World War II. *Id.* The plaintiffs and the Japanese government disagreed about whether peace treaties between Japan and plaintiffs' countries of origin extinguished war claims made against Japan by citizens of the plaintiffs' countries. *Id.* at 48. The State Department submitted a Statement of Interest stating "that judicial intrusion into the relations between Japan and other foreign governments would impinge upon the ability of the President to conduct the foreign relations of the United States." *Id.* In deciding the case, this Court "defer[red] to the judgment of the Executive Branch" as set forth in the Department's "thorough and persuasive Statement of Interest" and concluded that "our Constitution does not vest the authority to resolve that dispute in the courts." *Id.*

In another case involving the foreign policy interests of the United States, this Court also explained that "we grant substantial weight" to State Department statements regarding factual questions that are "at the heart of the Department's expertise." *In re Papandreou*, 139 F.3d 247, 252 & n.2 (D.C. Cir. 1998). Such questions, we said, include State Department determinations about the extent to which U.S. interests are affected by "the sensitive diplomatic considerations involved" in certain legal claims. *Id.* at 252 (internal quotation omitted). In addressing the related "act of state" doctrine, this Court similarly has recognized "the value of obtaining views of the Executive Branch in matters relating to the application of the act of state doctrine and giving appropriate weight to those views." *Millen Indus., Inc. v. Coordination Council*, 855 F.2d 879, 881 (D.C. Cir. 1988).

All of the above precedents have established the following principle of law: When presented with a suit alleging wrongdoing committed in a foreign country, and particularly a suit implicating the actions of foreign government officials, federal courts should dismiss the complaint on justiciability

grounds if the Executive Branch has reasonably explained that the suit would harm U.S. foreign policy interests.

2. Given those precedents and principles, the question in this case is whether the Executive Branch reasonably explained that this case would harm U.S. interests. I believe it clearly has done so.

In 2002 and then again in 2005, the State Department unambiguously stated to the District Court that, for multiple reasons, "adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism." D.A. 182. The State Department emphasized that Indonesia is "a focal point for U.S. initiatives in the ongoing war against Al Qaida and other dangerous terrorist organizations. U.S. counter-terrorism initiatives could be imperiled in numerous ways if Indonesia and its officials curtailed cooperation in response to perceived disrespect for its sovereign interests." D.A. 184. The Department explained that Indonesia would view this lawsuit as an intrusion on its sovereignty. The Department stated that "[t]his lawsuit could potentially disrupt the on-going and extensive United States efforts to secure Indonesia's cooperation in the fight against international terrorist activity." D.A. 184. The Department identified and explained multiple other effects on foreign relations, including, for example: an adverse impact on human rights objectives; negative effects on foreign investment, which would have negative impacts on stability and economic conditions; and decreased opportunities for U.S. business abroad. Along with its 2002 statement, the State Department submitted to the District Court a letter from the Indonesian Ambassador that stated, "As a matter of principle, we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian

government institution, . . . the Indonesian military, for operations taking place in Indonesia." D.A. 188. Then in July 2005, the State Department provided a new letter stating that the concerns set forth in its initial letter "remain valid today." D.A. 244. Enclosed with that letter was another letter from the Indonesian government, reiterating the concerns Indonesia first expressed in 2002. Nothing in the record since 2005 purports to withdraw the concerns raised by either the State Department or the Government of Indonesia.

In light of the decisions of the Supreme Court (*Sosa* in particular), this Court's decisions (*Hwang Geum Joo* in particular), and the State Department's reasonable explanation of how this litigation would harm U.S. foreign policy interests, this case should be dismissed as a non-justiciable political question. (In reaching this conclusion, my point is that the State Department's explanation of harms in this case is clearly *sufficient* to require dismissal of this suit. I do not mean to imply, however, that all of the harms cited by the State Department in this case are *necessary* in order for courts to give deference to the Executive Branch. In other words, courts defer to the Executive Branch's reasonable explanation that a case would harm U.S. interests even if the harm is something less than, for example, a negative impact on the war against al Qaeda.)

3. The District Court agreed with the above principles in dismissing the majority of plaintiffs' claims. In particular, the District Court relied on the State Department's statement that "'adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism.'" *Exxon Mobil Corp.*, 393 F. Supp. 2d at 22 (quoting State Department's 2002 Statement of Interest). The District Court also highlighted the

Supreme Court's warning in *Sosa* that courts should be "'particularly wary of impinging on the discretion of the Legislative and Executive branches in managing foreign affairs,' particularly when the Executive has expressed its views about the litigation." *Id.* at 23 (quoting 542 U.S. at 727) (internal citation omitted). And the District Court proceeded to dismiss plaintiffs' *federal*-law claims in part because "determining whether defendants engaged in joint action with the Indonesian military necessarily would require judicial inquiry into precisely what the two parties agreed to do" and "such an inquiry cuts too close to adjudicating the actions of the Indonesian government." *Id.* at 27.

Having gone that far, however, the District Court allowed plaintiffs' *state*-law claims to move forward. I believe the same justiciability concerns that the District Court identified with respect to the *federal*-law claims also apply to the *state*-law claims. Regardless whether plaintiffs are attempting to establish Exxon's liability for state-law claims or federal-law claims, plaintiffs must prove that members of the Indonesian military engaged in acts of violence in Indonesia against Indonesian citizens. As a result, the District Court necessarily would be "adjudicating the actions of the Indonesian government" when it continues adjudication of plaintiffs' state-law claims, just as the District Court would have done had it entertained plaintiffs' federal-law claims. Moreover, nothing in the State Department letter distinguished federal and state law claims in assessing the harm to U.S. foreign policy interests – indicating that the state-law claims pose just as much a threat to U.S. foreign policy interests as the federal-law claims. In sum, I respectfully submit that the District Court should have dismissed the state-law claims based on the same State Department concerns that supported the District Court's dismissal of the federal-law claims.

16

Because only state-law claims remain, plaintiffs' case also has a separate doctrinal problem – preemption. As the Supreme Court has stated, the possibility that state law (in this case, D.C. tort law) "will produce something more than incidental effect in conflict with express foreign policy of the National Government . . . require[s] preemption of the state law." *Garamendi*, 539 U.S. at 420. Although we need not resolve the issue here, the state-law tort claims are likely preempted as a result of the State Department's specific statement of harm to foreign policy. *See, e.g., id.* at 413, 424 (referencing Executive Branch statements regarding conflict caused by state law and stating: "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government in the first place.") (internal quotation omitted); *cf. Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 886 (2000) (holding that federal statute preempted state-law tort action); *see generally* Jack Goldsmith, *Statutory Foreign Affairs Preemption*, 2000 SUP. CT. REV. 175, 203-05, 213 (2000) ("[C]ourts should preempt state law only when the justification for preemption is fairly traceable to the foreign policy choices not of the federal courts, but rather of the federal political branches.").

4. For its part, the majority opinion says that the State Department has not "*unambiguously*" set forth its position on this lawsuit. The majority opinion seizes on footnote 1 of the State Department's 2002 Statement of Interest* and concludes

---

*The State Department's footnote 1 states: "Much of this assessment is necessarily predictive and contingent on how the case might unfold in the course of litigation. E.g., the nature, extent, and intrusiveness of discovery; the degree to which the case might directly

that this footnote undermines the Department's statement that "adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism." *See* Maj. Op. at 16-17; D.A. 182. I respectfully think the majority opinion misreads the State Department footnote – and as a result gives unduly short shrift to the State Department's Statement of Interest.

In the same way that Executive agencies often do when justifying decisions necessarily based on predictive judgments, footnote 1 simply sets forth the factors on which the State Department based its judgment that *the litigation itself* would harm U.S. foreign policy interests. Footnote 1 does not purport to lay out a roadmap for the District Court to alleviate the State Department's concerns as the litigation unfolds – for example, by fashioning the scope of the litigation in a certain way. To be sure, the Department said its ultimate judgment regarding the effect of this suit was "predictive" and "contingent" on several factors. But that truism is not a hook for the majority opinion to override the Department's bottom-line conclusion. After all, judgments of this kind are always predictive in the sense that the State Department can never know in advance precisely how future events will unfold and affect U.S. foreign policy.

---

implicate matters of great sensitivity to the Government of Indonesia and call for judicial pronouncements on the official actions of the GOI with respect to the conduct of its military activities in Aceh; the effect that a decision in favor of plaintiffs might encourage secessionist activities in Aceh and elsewhere in Indonesia; whether the case were to go to a jury and, if so, whether a substantial monetary award were to be imposed on Exxon Mobil; how other large commercial interests might interpret such a judgment when making investment decisions in Indonesia." D.A. 183 n.1.

The majority opinion does not grapple, moreover, with the illogic of this reading: Why would the State Department definitively say that "adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States" if the Department intended only to say that the District Court should make certain changes to the scope of the lawsuit to alleviate possible foreign policy concerns? The majority opinion interprets the footnote to contradict the remainder of the Department's letter – which shows, I believe, that the majority opinion's interpretation of the footnote cannot be correct.

The key point here is that the State Department thoroughly explained its reasoning and firmly stated that this suit would harm relations with Indonesia and therefore negatively affect the U.S. war against al Qaeda, among several other adverse effects on significant U.S. interests. As support, the Department attached the Indonesian Ambassador's letter stating that "we cannot accept the extra territorial jurisdiction of a United States Court over an allegation against an Indonesian government institution." D.A. 188. In my judgment, under the precedents that guide our analysis in this area, there is no persuasive basis for disregarding the Executive Branch's statement that "adjudication of this lawsuit at this time would in fact risk a potentially serious adverse impact on significant interests of the United States, including interests related directly to the on-going struggle against international terrorism." D.A. 182. The majority opinion's rejection of the definitive and reasoned Executive Branch statement about this lawsuit's negative impact on America's prosecution of an ongoing war does not reflect the judicial restraint and deference that the Supreme Court and this Court have required in the sensitive area of foreign policy. *See* Maj. Op. at 16-17.

5. In analyzing the justiciability issue, the majority opinion seeks to buttress its conclusion by citing the decisions of "several other circuits" that purportedly "have refused to invoke the political question doctrine to dismiss claims that were very similar to those in the instant case." Maj. Op. at 17. Only one post-*Sosa* case cited by the majority opinion has addressed the political question doctrine in the context of a State Department Statement of Interest – the Ninth Circuit's divided decision in *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069 (9th Cir. 2006). (In *Sarei*, residents of Papua New Guinea alleged corporate complicity in human rights violations committed by the Government of Papua New Guinea. *Id.* at 1073-75.)

The court in *Sarei* accepted the premise of the Supreme Court's statement in *Sosa* footnote 21 – namely, that courts should defer to the Executive Branch's reasonable explanations of harm in cases against private entities. *See id.* at 1081. But the Ninth Circuit refused to defer to the particular State Department statement in that case. *Id.* at 1082-83. For purposes of our analysis, two points are important about *Sarei*: First, the State Department's Statement of Interest in *Sarei* was "guarded," so the Ninth Circuit's opinion is not particularly instructive to our decision here, in which the State Department's statement is strongly worded and clearly identifies a negative effect on, among other things, U.S. prosecution of an ongoing war. *Id.* at 1082. Second, in any event, I would not follow the Ninth Circuit's opinion in *Sarei* because I respectfully believe the decision is incorrect for reasons well stated by Judge Morrow in her thorough and persuasive District Court analysis in that case:

> Ruling on the merits of these allegations will inevitably require passing judgment on the pre-war and war-time conduct of the PNG government. It is this type of judgment that the Statement of Interest indicates may

have serious implications for the future of the peace agreement that has been reached, and thus for the foreign policy objectives the executive branch has set. It is also the type of judgment that risks placing the court in the position of announcing a view that is contrary to that of a coordinate branch of government, with all the attendant embarrassment that would ensue. The situation is thus quintessentially one that calls for invocation of the political question doctrine as to each of plaintiffs' causes of action.

*Sarei v. Rio Tinto, PLC*, 221 F. Supp. 2d 1116, 1198-99 (C.D. Cal. 2002).

III

The final question here is whether this Court possesses the authority to entertain this interlocutory appeal. In my judgment, the standard for this Court to issue a writ of mandamus is plainly satisfied. To be sure, "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976) (internal quotation omitted). A court will issue the writ "only upon a showing that the petitioner's right is 'clear and indisputable,' and that 'no other adequate means to attain the relief' exist." *In re Sealed Case*, 141 F.3d 337, 339 (D.C. Cir. 1998) (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988) and *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980)) (internal citation omitted).

The Supreme Court has made clear that mandamus is appropriate to prevent interference with foreign policy responsibilities that the Constitution has allocated to the Executive and Legislative Branches. In granting a writ of mandamus in *Ex parte Republic of Peru*, for example, the

Supreme Court stated that cases intruding on the foreign policy responsibilities of the Executive Branch can be "of such public importance and exceptional character as to call for the exercise of our discretion to issue the writ." 318 U.S. 578, 586 (1943). In lawsuits involving the "dignity and rights of a friendly sovereign state," the Court noted, "it is of public importance that the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings in the district court." *Id.* at 587.

The Supreme Court recently reiterated the principles of *Ex parte Peru*, indicating that mandamus is warranted when a lawsuit "would threaten the separation of powers by 'embarrass[ing] the executive arm of the Government.'" *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380-81 (2004) (quoting *Ex parte Peru*, 318 U.S. at 588). The *Cheney* case re-affirmed that mandamus is proper "to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities." *Id.* at 382; *see also In re Austrian & German Holocaust Litig.*, 250 F.3d 156, 163-65 (2d Cir. 2001) (in issuing writ of mandamus, court relies on political question doctrine and states that courts should not intrude on foreign policy prerogatives of political branches).

The majority opinion suggests that the mandamus principles articulated in *Ex parte Peru* and reiterated in *Cheney* are properly applied only in cases in which the property of a foreign government is at stake or a governmental entity is a party to a suit. *See* Maj. Op. at 18-19. I believe the majority opinion's attempt to distinguish *Ex parte Peru* is misplaced for two reasons – one factual and one legal.

First, as a factual matter, the foreign policy effect of plaintiffs' claims is not distinct from the effect of claims challenging the property or actions of a foreign government. Establishing liability against Exxon necessarily requires proving that members of the Indonesian military – acting pursuant to a contract entered into by the Indonesian Government – committed acts of violence against Indonesian citizens in Indonesia. Such proof is a necessary component of establishing either Exxon's vicarious liability for the alleged violent acts or Exxon's direct liability for negligently hiring the alleged bad actors. And the governmental nature of the allegations is why the Government of Indonesia has objected to this case (and why the Executive Branch is therefore concerned about it). *See* D.A. 183 (State Department's 2002 Statement of Interest: "All of the human rights abuses and injuries alleged in the complaint refer to conduct claimed to have been committed by the military and police forces of the GOI."). Therefore, I believe the majority opinion is incorrect to imply that this is somehow just a routine lawsuit involving allegations against a private corporation. *Cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003). Rather, this suit alleges wrongdoing by members of a foreign military who were supplied by a foreign state-owned entity to provide security at a facility offering vital infrastructural services for a foreign nation.

Second, apart from that factual hole in the majority opinion's distinction of *Ex parte Peru*, the key question for purposes of mandamus (as it is for assessing justiciability) is whether the Executive Branch has reasonably explained that the foreign policy interests of the United States would be adversely affected – not the identity of the named parties in the lawsuit. In *Ex parte Peru*, for example, the Supreme Court instructed that a district court should terminate litigation when that litigation adversely affects the foreign policy interests of the United

States. *See* 318 U.S. at 586-87 ("The case involves the dignity and rights of a friendly sovereign state, claims against which are normally presented and settled in the course of the conduct of foreign affairs by the President and by the Department of State."). There is no logical or principled basis for granting mandamus in *some* cases that severely affect the foreign policy interests of the United States, but not in other cases, just because of the named defendants. *Cf. Sosa*, 542 U.S. at 733 n.21. The rule of *Ex parte Peru* is straightforward: If the District Court incorrectly green-lights a lawsuit that would adversely affect the foreign policy interests of the United States, mandamus is warranted.

Finally, the majority opinion also suggests that mandamus is not warranted because the District Court narrowed the litigation to protect U.S. interests. Maj. Op. at 15-16. But the U.S. foreign policy interest here is not simply in avoiding the effects of a final judgment, but is in avoiding the repercussions of *the litigation itself*. In cases (analogous for these purposes) involving foreign sovereign immunity, courts therefore have recognized that mandamus is an appropriate remedy when the litigation itself could harm the interests underlying sovereign immunity. *See, e.g.*, *Ex parte Peru*, 318 U.S. at 587 ("[I]t is of public importance that the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation be avoided by prompt termination of the proceedings in the district court."); *In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998) (granting mandamus in case involving foreign sovereign immunity: "[S]overeign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits.") (internal quotation omitted). The same rationale applies here.

24

IV

Although I disagree with the majority opinion's resolution of this case, there appears to be common ground about how litigation of the remaining state-law claims should proceed in the District Court. The State Department again will have an opportunity to express its views (previously expressed in 2002 and 2005) regarding this suit. If the State Department were to withdraw its previously stated opposition to the state-law claims, then I would agree that the state-law claims would not be barred by the political question doctrine. *See First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 768 (1972) (plurality opinion of Rehnquist, J.) (suit against foreign government corporation may proceed because Executive Branch "has advised us" that suit would not "frustrate the conduct of this country's foreign relations"). On the other hand, I assume the majority would agree that the District Court should dismiss the case if the State Department reasonably and unambiguously states that litigation of the state-law claims would affect U.S. foreign policy interests. *See* Maj. Op. at 16-17. Indeed, even plaintiffs' counsel appeared to agree at oral argument that dismissal by the District Court (and, if not, then mandamus by this Court) would be warranted if the State Department reasonably explained to the District Court that the remainder of this case would negatively affect U.S. efforts in the war against al Qaeda. *See* Tr. of Oral Arg. at 23-24. Therefore, I expect that the District Court will obtain the State Department's specific views on the remaining state-law claims in the litigation and proceed accordingly.

\* \* \*

In light of the precedents of the Supreme Court and this Court, and the State Department's reasonable explanation of how this lawsuit would harm U.S. interests, I would grant the

petition for a writ of mandamus and order dismissal of the complaint as a non-justiciable political question. I respectfully dissent.